# United States Court of Appeals
## For the First Circuit

Nos. 14-1745
     14-1756

JOSEPH TRAVERS,

Plaintiff, Appellee, Cross-Appellant,

v.

FLIGHT SERVICES & SYSTEMS, INC.,

Defendant, Appellant, Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

Jeffrey M. Rosin, with whom Christopher M. Pardo and Constangy, Brooks & Smith LLP were on brief, for appellant, cross-appellee.
Shannon Liss-Riordan, with whom Lichten & Liss-Riordan, P.C., was on brief, for appellee, cross-appellant.

December 15, 2015

**BARRON**, **Circuit Judge**.   A company that provides skycap services to airlines was defending against a class action lawsuit when one of the skycaps that the company had employed brought his own individual suit against the company.   The skycap alleged in his suit that the company had fired him for his role in helping to organize the class action.   A jury eventually found for the skycap in that unlawful-termination suit.   And the company now appeals both from that verdict and from the District Court's award of damages and attorney's fees and costs.   Because we find no error in any of the District Court rulings that the company challenges, we affirm them.

At the same time, the skycap who won the retaliatory-termination suit cross-appeals.   He contends that the District Court erred by eliminating and not trebling the jury's award of front-pay damages, failing to grant his request to treble the emotional-distress damages award that the District Court had ordered on remittitur, and denying his request for prejudgment interest.   We affirm the District Court's decisions not to treble and not to grant prejudgment interest on the emotional-distress damages, but we vacate the District Court's elimination of any front-pay award and remand for further proceedings.   In addition, we certify a question to the Massachusetts Supreme Judicial Court regarding the award of prejudgment interest on Travers's back-pay damages.

The defendant in both the class action and the unlawful-termination suit is Flight Services and Systems, Inc. (FSS). This company provides skycap services for JetBlue at Boston's Logan International Airport. The skycaps work on the curb just outside the airport, where they issue boarding passes and check luggage. The skycaps receive low wages and so, like most waiters and waitresses, rely on tips for the bulk of their pay.

The named plaintiff in the class action against FSS is the same plaintiff who brings the retaliatory-termination suit. He is Joseph Travers, a skycap FSS employed to service JetBlue customers at Logan.

The class action -- which Travers helped to organize -- concerns JetBlue's 2008 decision to charge $2 per bag for luggage checked in via skycap and then to have JetBlue, and not the skycaps, keep that $2 fee. The complaint -- captioned "Travers v. JetBlue and FSS" -- contends that the new fee diminished the tip income skycaps received from customers and violated both the Massachusetts wage and tips law and the federal Fair Labor Standards Act (FLSA).

The source of the present dispute is FSS's decision, while that class action was pending, to fire Travers. Travers alleges that FSS did not fire him because -- as FSS contends is the case -- a customer had complained that Travers had solicited

a tip from her.  Travers's suit alleges, instead, that FSS fired him in retaliation for his role in organizing the skycaps' class action against JetBlue and FSS and that FSS relied on the tip-solicitation complaint as a pretext for that retaliatory firing. Travers's suit further contends that, in consequence, FSS violated both the FLSA and the Massachusetts wage and tips law, as each of those laws prohibits a company from taking adverse action against an employee who seeks to obtain the protection that those laws provide.  See 29 U.S.C. § 215(a)(3); Mass. Gen. Laws ch. 149, § 148A.

Before Travers's retaliation suit went to the jury, the District Court granted summary judgment to FSS.  But we then reversed.  Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 145 (1st Cir. 2013).  We held that, on the summary judgment record, "a reasonable jury could return a verdict for Travers without relying on improbable inferences or unsupported speculation."  Id.

On remand, the case went to trial, and a jury found FSS liable for retaliatory termination in violation of both the federal and state statutes.  The jury rendered its verdict in a single verdict form that did not differentiate between the state and federal claims or apportion the award between them.  The jury awarded Travers $90,000 in back pay, $450,000 in front pay, and $400,000 for emotional distress.

- 4 -

Following the verdict, FSS renewed its previous motion for judgment as a matter of law, see Fed. R. Civ. P. 50(b), and also moved in the alternative for a new trial or to amend the judgment. See Fed. R. Civ. P. 59. The District Court ordered Travers to remit all but $50,000 of the emotional-distress damages or face a new trial. And the District Court also eliminated the entire front-pay award as unsupported by the evidence.

Travers then sought, under separate state statutes, to have the damages award trebled, to receive attorney's fees and costs, and to receive prejudgment interest. See Mass. Gen. Laws ch. 149, § 150; id. ch. 231, § 6B. With respect to trebling, the District Court agreed to treble the back-pay award to $270,000, but declined to treble the award for emotional distress. The District Court also did not order the prejudgment interest that Travers had requested, though the District Court did grant Travers attorney's fees in the amount of $176,185 and costs of $7,398.45.

FSS and Travers timely filed these appeals.[1]

---

[1] We discuss the federal and state claims separately only insofar as doing so is relevant to our analysis.

FSS raises five distinct arguments in its appeal, and we consider each one before turning to Travers's cross-appeal.

**A.**

FSS's primary argument on appeal is that the District Court erred in denying FSS's motions for judgment as a matter of law because "a reasonable jury would not have a legally sufficient evidentiary basis to find for [Travers]." Fed. R. Civ. P. 50(a)(1). To win on his retaliation claims at trial, Travers had to show (1) that he engaged in conduct that the FLSA and Massachusetts wage and tips law protect when he participated in the class action against FSS, (2) that FSS subjected Travers to an adverse employment action when the company fired him, and (3) that FSS fired him because of his protected conduct. See Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004) (describing elements of a claim under 29 U.S.C. § 215(a)(3)); Smith v. Winter Place LLC, 851 N.E.2d 417, 421 (Mass. 2006) (interpreting Mass. Gen. Laws ch. 149, § 148A).

FSS does not dispute that, under both the federal and the state statutes on which Travers's individual suit rests, Travers engaged in protected conduct or that FSS subjected him to an adverse employment action. The dispute concerns only what caused FSS to fire Travers -- his help in organizing the class

action or, as the company contends, his solicitation of a tip in violation of company policy.

To resolve this dispute, we need not decide the precise standard of causation that a plaintiff must meet to prove unlawful retaliation under either the state or federal statutes on which Travers's suit rests. The parties appear to agree, as they did when this case came before us on summary judgment, that each statute requires the plaintiff to show "but-for" causation to prove retaliation. See Travers, 737 F.3d at 147 & n.1.

Thus, our task is straightforward. Because we are reviewing a renewed motion for judgment as a matter of law following a jury verdict, we must view the evidence of causation "in the light most favorable to the verdict" and "affirm unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 2009) (quotation marks and citations omitted).

FSS argues that it is entitled to judgment as a matter of law because the trial record provides too little evidence to support a finding of but-for causation if we exclude -- as FSS says we must -- one particular piece of testimony that the jury heard. This testimony came from Travers, and it concerned what

Travers contends Rob Nichols, a mid-level manager in charge of FSS operations at Logan, told him.

Travers testified that Nichols told him that FSS's owners and senior managers told Nichols that the lawsuit "was costing [the company] a lot of money, and that [Nichols] should get rid of Travers." Travers went on to testify that Nichols also advised Travers to drop the lawsuit because, otherwise, Travers would "probably lose [his] job."

At trial, the District Court rejected FSS's contention that Travers's testimony concerning Nichols should be excluded as hearsay. After the jury returned a verdict for Travers, however, the District Court revisited this ruling in connection with FSS's motion for judgment as a matter of law. In doing so, the District Court changed its mind and concluded that Travers's testimony concerning Nichols should have been struck. But the District Court still denied FSS's motion for judgment as a matter of law.[2]

---

[2] Under Federal Rule of Evidence 801(d)(2)(D), testimony about an out-of-court statement by a non-testifying person is not hearsay if "[t]he statement is offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Travers testified on direct examination that his conversation with Nichols occurred in early summer of 2010. But on cross-examination, when FSS's counsel noted that Nichols had been fired by FSS in the spring of 2010 (and so would not have been employed by FSS in the early summer of 2010), Travers apologized for mixing up the dates. Travers clarified that the conversation occurred in the spring of 2010 "right before [Nichols] was terminated." Although Travers's testimony about Nichols was before the jury when it returned its verdict, the District Court later concluded that Nichols's

- 8 -

FSS now argues that the District Court was right the second time that it ruled on whether Travers's testimony concerning Nichols should have been struck as hearsay. And FSS goes on to argue that, without that testimony, the record does not permit a reasonable jury to conclude that FSS fired Travers because of his role in organizing the class action. See Weisgram v. Marley Co., 528 U.S. 440, 453-54 (2000) (discussing excising certain inadmissible evidence from the record for purposes of reviewing a renewed motion for judgment as a matter of law). Instead, FSS argues, the evidence that remains shows only that FSS fired Travers because the company believed Travers had solicited a tip from a customer.[3]

In support of that contention, FSS notes that Susan Collier -- the manager who actually fired Travers -- testified

---

statement to Travers "was made post-employment" and thus Nichols had not been an agent of a party-opponent at the time he made these statements. For that reason, the District Court concluded that the statements should have been excluded as hearsay.

[3] FSS notes that, in reversing the District Court's earlier grant of summary judgment in this case, we relied on the Nichols evidence. There, we explained that a reasonable jury might rely on the Nichols evidence to conclude that "retaliatory animus resided at the apex of the organizational hierarchy" and "spread to other managers," including the manager that decided to fire Travers. Travers, 737 F.3d at 147. But our opinion, even on the summary judgment record, did not contend that the Nichols evidence was necessary, only that it was sufficient. And, of course we are now assessing the denial of the motion for a judgment as a matter of law. Thus, the record before us is different from the one presented on summary judgment. Nothing in our decision here, therefore, is at odds with our prior ruling in this litigation.

- 9 -

that the company fires a skycap every time a passenger complains in writing that, in the passenger's opinion, the skycap tried to solicit a tip. And Collier did also state that "if the passenger takes the time to stop and make a written complaint, it happened," and thus that the written complaint the customer filed against Travers here -- though the customer never testified at trial -- supplied a foundation for the company's conclusion that Travers made the solicitation.

But although a jury could have believed the reason that FSS gave for firing Travers, a jury was not compelled to do so on this record. For while the remaining evidence does not reveal a smoking gun proving retaliation -- or even include direct evidence of a command from on high to fire Travers to disrupt the class action suit -- the remaining evidence is sufficient to support an inference of retaliation. See Speen v. Crown Clothing Corp., 102 F.3d 625, 635 (1st Cir. 1996) ("[A] plaintiff need not . . . produce 'smoking-gun' evidence . . . . There are many veins of circumstantial evidence that may be mined . . . ."); Wooster v. Abdow Corp., 709 N.E.2d 71, 76 (Mass. App. Ct. 1999) (stating that "smoking gun evidence . . . is not required" and that the "plaintiff's ultimate burden of persuasion may be satisfied . . . [by] circumstantial evidence" (quotation marks and citation omitted)).

To begin with, a jury could disbelieve Collier's testimony about the necessary consequences that follow -- as a matter of FSS policy -- from a customer's submission of a written complaint about an employee's solicitation of a tip. Collier herself testified that the determination of whether an employee did solicit a tip requires the exercise of judgment. As Collier put it, you have to look at the "facts and circumstances of every case." And the evidence also indicated that FSS undertakes an investigation following a customer complaint before determining whether or not tip solicitation actually occurred.

In addition, testimony from Nabil Agba, a former FSS skycap supervisor in Boston, indicated that termination was not automatic upon receipt of a complaint and, indeed, could depend on factors unrelated to whether tip solicitation had, in fact, occurred. Agba testified that "there was not a standard process" for who would get fired and who would not following accusations of tip solicitation. Instead, Agba testified that the general manager in Boston would base his recommendation to Collier on "the employee records and the job performance" of the employee and sometimes would "just chalk-up the accusation to some type of miscommunication with the passenger" and not fire the skycap. Notably, Agba clarified that managers' attitudes toward employees colored the ultimate decision: "From my experience, if they like

- 11 -

the person, they try to help them and protect them as much as they can."

Thus, a jury could have reasonably concluded that a customer complaint about tip solicitation would not automatically lead to the dismissal of the employee who allegedly made the solicitation.  Instead, a jury could reasonably have found that factors unrelated to whether the solicitation occurred could bear on the disciplinary consequences that would follow.  And so long as the jury was free to conclude that FSS had the discretion to make a judgment whether to fire despite a complaint -- and to make that judgment for reasons unrelated to whether the solicitation in fact occurred -- the jury was also free to consider whether some reason other than the customer complaint tipped the balance, so to speak, with regard to the decision to fire Travers.

Of course, the record must still contain enough evidence to support a jury's conclusion that this other reason was the company's desire to retaliate for Travers's protected conduct.  But we conclude that the jury did have before it enough evidence to support a reasonable inference in that regard -- even if we strike from consideration Travers's testimony that Nichols had told him about the instruction from higher officials to fire Travers due to his involvement in the class action.  For while the remaining testimony was not as directly probative on that point as

was the testimony from Travers about what Nichols had supposedly said to him, the rest of the evidence was still strong enough.

In particular, the jury heard testimony from other FSS employees -- in management positions -- that indicated that FSS's owners and senior managers were very concerned about the skycap class action. Nabil Agba, the former FSS skycap supervisor, testified that there was "a lot of talk among FSS managers about [the underlying] lawsuit" and that he "always heard [from the FSS Boston general manager that] the corporate [leadership] is not happy about [the skycaps' class action]." And Agba further testified that FSS's chief executive officer told the local FSS Boston manager (who then told Agba) that "we can't afford to lose cases because [the CEO] doesn't like it."

The jury also heard evidence that reasonably linked those general concerns within management about the class action to concerns about Travers's involvement in the class action in particular. For example, the jury had before it evidence that Susan Collier, the FSS manager who actually fired Travers, was aware of senior management's concerns about the skycaps' lawsuit and that she was responsible for addressing those concerns. Her own testimony showed that she was the point person on FSS's defense against the lawsuit and that she spoke with FSS's president about

the case frequently.[4]  And Collier agreed that the president was increasingly frustrated with the expense of litigation -- expenses that she was responsible for minimizing and justifying.

Moreover, Collier's testimony provided support for concluding that she knew about Travers's leading role in the skycaps' class action at the time she made the decision to fire him.  Collier herself testified that she knew when she fired Travers that Travers was a plaintiff.  And while she denied knowing he was the lead plaintiff, the caption for the case for which she was the point person was "Travers v. JetBlue and FSS."

Against this background, Travers's testimony about a conversation that he had with an FSS duty manager at Boston Logan helps to support a reasonable inference of retaliation.  According to Travers, the duty manager, Eqerem Mero, expressly warned Travers that his job was in jeopardy because of FSS management's dislike of Travers's role in the skycaps' class action by saying: "These guys, they're rich.  They're powerful.  They're dangerous.  They -- you know, you're going to lose your job over this.  You should get out of the lawsuit."  And Travers also testified that Arbin Cote, an FSS assistant manager at Boston Logan, told him that he "should stop and get out of the lawsuit."

---

[4] Collier even stated in her deposition that she "always" spoke with the company president about the case, though she quibbled with "always" in her live testimony.

- 14 -

This testimony from supervisors and managers about how Travers's role in the class action placed his job in jeopardy is especially significant given Travers's testimony about a curious exchange that he had with the Boston manager who recommended that Collier fire Travers after that manager had been assigned to investigate the complaint that Travers had solicited a tip. Travers testified that, during the tip-solicitation investigation, he asked that manager, Lisa Varotsis, when he could get back to work and that she replied, "You know why this is happening." Travers further testified that he then asked that manager if the investigation was happening because of his role in the skycaps' class action, and Varotsis replied, "I can't talk about it," and walked away.

Thus, on Travers's account, when he confronted the person responsible in the first instance for deciding whether he had solicited the tip, she seemingly declined to confirm in the straightforward way one might otherwise expect that the tip-solicitation complaint was the actual reason for the investigation into that complaint. And, indicating that she was barred from doing so, she refused to comment on whether the real reason for the investigation was his role in the class action. See Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662-63 (1st Cir. 2010) ("Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or

- 15 -

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997))); City of Salem v. Mass. Comm'n Against Discrimination, 693 N.E.2d 1026, 1038 (Mass. App. Ct. 1998) (same), overruled on other grounds by Trustees of Health & Hosps. of Boston, Inc. v. Mass. Comm'n Against Discrimination, 839 N.E.2d 861 (Mass. App. Ct. 2005).

Finally, and also supporting Travers's account, Nabil Agba testified that he overheard the Boston general manager of FSS saying -- after Travers had been fired -- that "[t]he plan [to defend against the class action] was to get more [plaintiffs] to drop out of the case," and, "after a few months, people started dropping out." Agba also testified that the general manager spoke with skycaps one by one about the class action and that skycaps started dropping out of the case just a few months after Travers was fired.

There are potentially innocent interpretations of each of the facts related by these witnesses, even assuming their testimony should be credited. The lower-level managers' warnings about what would happen to Travers if he stayed involved in the class action litigation, for example, could be dismissed as speculative predictions about what might happen rather than solid

- 16 -

assessments about management's intentions derived from comments made by higher-ups within FSS. Similarly, Varotsis's comment that Travers "kn[e]w why this is happening" could have been a reference to the customer's accusation of tip solicitation and nothing more, while her statement that she could not talk about the reason for the investigation might have been unrelated to a direction from above and not motivated by a desire to cover up an impermissible purpose. And Agba's statements about management's plan to get the class action plaintiffs to drop out -- even if true -- do not expressly allege that that plan involved an effort to fire employees on trumped-up grounds.

But while the jury did not have to find for Travers on the basis of this evidence, the jury did find for him. And for purposes of this appeal, that is decisive. Whatever holes one might poke in the evidence that favored Travers's version of events, that evidence considered as a whole was not so deficient that no reasonable jury could have relied on it in finding for Travers. Rather, the jury could reasonably have concluded that the evident concerns within FSS about the class action suit in general, and Travers's role in that litigation in particular, made plausible the direct warnings that Travers says that he received from supervisors and managers that he would be fired for his involvement. And Travers's testimony about the company investigator's seemingly odd reluctance to confirm that the

tip-solicitation complaint was the reason for the investigation -- reflected in her comment, "I can't talk about it" -- lends additional credence to that interpretation of the evidence. So, too, does the FSS manager's testimony about the plan to get skycaps to drop out of the class action in the wake of Travers's firing. See Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 29 (1st Cir. 2012) (affirming denial of motion for judgment as a matter of law in a retaliatory termination case under the Age Discrimination in Employment Act "[b]ecause the record supports conflicting versions of the truth, [so] it became the jury's function -- not the court's -- to choose between these versions"); cf. Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 171 (1st Cir. 1998) ("Statements by supervisors carrying the inference that the supervisor harbored animus against protected classes of people or conduct are clearly probative of pretext" and retaliatory termination "even if that inference is not the only one that could be drawn from the comment." (emphasis added) (citations omitted)).

In light of this evidence, we need not decide whether the tip-solicitation complaint was in fact well founded -- a point that Travers vigorously contests. It is enough to observe that the jury could decide for itself, and reasonably so, that FSS had discretion at the time it chose to fire Travers, notwithstanding the tip-solicitation complaint, and that FSS chose to exercise that discretion adversely to Travers because of his role in the

class action and then relied on the tip-solicitation explanation as a pretextual cover.[5]  We thus have no basis on this record to second-guess the District Court's decision that the jury should not be second-guessed.  Accordingly, we affirm the District Court's decision to deny the motions for judgment as a matter of law.

**B.**

Even if the evidence sufficiently supports the verdict without Travers's testimony concerning Nichols, FSS argues, the District Court still erred by denying the company's motion for a new trial under Federal Rule of Civil Procedure 59(a)(1)(A).  FSS identifies the error that requires a new trial as the District Court's decision to admit Travers's testimony that Nichols had told him about the retaliatory threat from FSS's chief executive officer.  FSS contends that the verdict must be thrown out because

---

[5] For this reason, we need not dive deeply into what the evidence shows about how other skycaps who had been accused of tip solicitation were disciplined by FSS in the past.  The parties sharply dispute whether Travers was treated just like these other employees.  But whatever the record shows about the handful of cases that are the focus of the parties' dispute on that score, the record shows that there was conflicting testimony about whether the company had discretion to fire (or not) an employee who had solicited a tip.  One witness testified that the company had such discretion and exercised it based on whether the company "like[d]" the employee.  That testimony and the other testimony regarding FSS's discretion, in our view, provides a basis for a jury to conclude that FSS had discretion about whether to fire Travers, even if he had engaged in the same kind of tip solicitation that resulted in the firing of other employees.  For that reason, the key issue concerns whether the record reasonably supports a finding that the company exercised this discretion in Travers's case due to his role in the class action.

Travers's testimony about Nichols was inadmissible hearsay that was so highly prejudicial that it irrevocably tainted the jury's verdict, even if the remaining evidence (standing on its own and thus untainted by what the jury heard about Nichols's conversation with Travers) could have been enough to sustain the verdict against a motion for judgment as a matter of law.

But FSS failed to present this argument about prejudice in the motion for a new trial that FSS filed in the District Court, as that motion relied on distinct grounds. See Docket Entry No. 152, at 16-21.[6] And even if we were to look past FSS's failure to raise this argument until now, see Sampson v. Eaton Corp., 809 F.2d 156, 161 (1st Cir. 1987) (concluding that an evidentiary issue, as a "discretionary matter . . . peculiarly appropriate" for resolution in the district court, is waived when not raised in a new-trial motion, and declining to review it further on appeal), we would review this unpreserved claim only for plain error.

---

[6] FSS did argue below that the Nichols testimony was improperly admitted into evidence and was prejudicial, but FSS did so only in connection with its motion for judgment as a matter of law, in which FSS argued that the absence of Travers's testimony about Nichols left a fatal hole in Travers's proof of retaliatory animus. See Docket Entry No. 152, at 12-16. FSS offered no argument below as to why erroneous admission of the Nichols testimony tainted the jury such that a new trial was required even if the evidence remaining was otherwise sufficient to support the verdict. Instead, FSS's argument for a new trial rested on other ways in which FSS contends the jury was exposed to material it should not have been.

But FSS raised this new-trial argument only by referencing it in a single sentence in the summary of argument, and in another lone sentence in the argument section that is accompanied by a citation to a single case that involved a preserved evidentiary argument and so did not involve plain-error review. FSS thus makes no argument on appeal for why we should conclude the District Court's error here (if indeed there was error) was clear and obvious, prejudicial, and resulted in a miscarriage of justice, as we would have to conclude to reverse under the plain-error standard. See Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) (per curiam) (applying plain-error review to unpreserved claim of error in a civil case); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

True, the District Court did conclude after the trial that it had erred in allowing the jury to hear the testimony from Travers about what Nichols told him. But the question on plain-error review is not whether the District Court was right to find that its first pass on the hearsay issue was mistaken. The question is whether the decision to deny the new trial was obviously wrong -- a standard that would not seem to be met in a case involving an evidentiary judgment call about the testimony concerning Nichols that was at least a close one. And even

- 21 -

assuming the initial evidentiary ruling was plainly wrong, there still would remain on plain-error review the question whether the decision to deny a new trial resulted in a miscarriage of justice, given all of the other testimony that the jury could have relied on to support Travers's claim of unlawful retaliation.

In the absence of any focused arguments by FSS as to why the error was obvious or the harm so great as to cause a miscarriage of justice, we decline to conclude that the company's unpreserved challenge to the District Court's denial of the motion for a new trial should succeed. See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 811 (1st Cir. 1988) ("Where . . . the district court's ruling would call into play a discretionary matter, peculiarly appropriate for that court, it becomes more important to bring the error first to that court's attention." (quoting Sampson, 809 F.2d at 161)); see also Zannino, 895 F.2d at 17. We thus affirm the decision to deny the motion for new trial.

### c.

FSS next challenges the jury's award of back pay, which, after the District Court trebled it, totaled $270,000. See Mass. Gen. Laws ch. 149, § 150. FSS raises three distinct arguments, each of which relies on Travers's testimony that he under-reported his tips to FSS. We reject each argument.

FSS first argues that we must reduce or eliminate the award because Travers has unclean hands due to his under-reporting of tip income to FSS. The District Court rejected this argument, concluding that "it is troubling that there may have been . . . a whiff of suspected tax fraud . . . but . . . this was not a tax case and it is not my job to prosecute people for potential tax violations." We review this decision to withhold an equitable defense for abuse of discretion, Murphy v. Timberlane Reg'l Sch. Dist., 22 F.3d 1186, 1189 (1st Cir. 1994), and we find none here.

"The doctrine of unclean hands only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties, that is, when the tawdry acts in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 880 (1st Cir. 1995) (quotation marks and citation omitted); see also N.Y., N.H. & H.R. Co. v. Pierce Coach Lines, 183 N.E. 836, 837 (Mass. 1933) ("[E]quity will not interfere in behalf of one who is guilty of illegal or inequitable conduct in the matter with regard to which he seeks its action . . . ."). FSS cites no evidence, however, indicating that Travers's under-reporting of tips affected his equitable relationship with FSS in the context of this retaliation case, and not just his relationship with the government in the context of a potential tax complication. Cf.

Atl. Limousine, Inc. v. N.L.R.B., 243 F.3d 711, 715-18 (3d Cir. 2001) (rejecting argument that the National Labor Relations Board must base its back-pay determination on the tips employees reported on income tax returns and not the higher amount of tips claimed in testimony because the harm of discrimination and the harm of tax avoidance are distinct and can each be remedied in separate procedures).[7]   And, even assuming Travers did harm FSS by under-reporting his tips, FSS does not cite evidence indicating the magnitude or nature of that harm.  Accordingly, we decline to disturb the District Court's weighing of the equities.  We thus conclude the District Court acted well within its discretion in rejecting the unclean-hands argument.

FSS next argues that the back-pay damages should be eliminated under the "after-acquired evidence doctrine," which we have described as cutting off damages "at the time that the defendant discovers evidence that would have led it to fire the plaintiff on legitimate grounds."  Johnson v. Spencer Press of

---

[7] FSS cites Hubert v. Consolidated Medical Laboratories, 716 N.E.2d 329 (Ill. App. Ct. 1999), for the proposition that the unclean-hands defense should prevent Travers from recovering back pay here.  But in Hubert, the plaintiff had engaged in wrongdoing that was the basis for her claim of having engaged in protected conduct for which, in retaliation, her employer allegedly fired her.  Id. at 335.  The court declined to allow the plaintiff to recover "from the defendants based on circumstances directly arising from her own misconduct."  Id.  But Travers's participation in the class action, and not his under-reporting of tips to FSS, is the protected conduct for which a jury held FSS retaliated.  Thus, his wrongdoing is not the basis for FSS's liability.

- 24 -

Maine, Inc., 364 F.3d 368, 382 n.14 (1st Cir. 2004) (emphasis added); see also City of Springfield v. Civil Serv. Comm'n, 14 N.E.3d 241, 249 n.14 (Mass. 2014) (describing the same doctrine in state law). But FSS's tip-reporting policy stated only that failure to file a tip-reporting sheet each pay period "may" lead to termination. There was no evidence in the record that a skycap had been terminated for failure to report tips, much less any evidence indicating that Travers's infractions would have led to termination. We thus conclude that the District Court did not abuse its discretion in withholding this equitable remedy. See Murphy, 22 F.3d at 1189 (reviewing withholding of equitable defense for abuse of discretion); see also McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 360 (1995) (after-acquired evidence is an equitable doctrine).

Finally, FSS argues that the back-pay award of $90,000 is unsupported by the evidence if we credit the amount of tips Travers reported to FSS -- sometimes just $40 a day -- rather than the much higher amounts of $200 to $250 a day that he testified to receiving. But FSS cites no authority for its assertion that a jury, in making the loss calculation, could not rely on Travers's testimony about what he had lost and that a jury was required instead to rely only on what Travers reported in terms of tip income. Thus, because evidence that the jury was entitled to credit supported the back-pay award -- as the jury could have found

- 25 -

that Travers did not report the full extent of his tip income -- we see no basis for reversal. See Dopp v. Pritzker, 38 F.3d 1239, 1249 (1st Cir. 1994) ("[A] reviewing court will not tinker with the jury's assessment of money damages [even for economic harms] as long as it does not fall outside the broad universe of theoretically possible awards that can be said to be supported by the evidence."); Beaupre v. Cliff Smith & Associates, 738 N.E.2d 753, 768 (Mass. App. Ct. 2000) (upholding back-pay award as supported by sufficient evidence where the award was supported by plaintiff testimony about difference in earnings at old job and new job and time elapsed since termination); cf. Atl. Limousine, 243 F.3d at 715-17 (concluding that the National Labor Relations Board is not bound by under-reported tip amount in calculating lost tip income).

## D.

FSS contests the amount of damages ordered for emotional distress as well. The jury awarded $400,000, but the District Court then ordered remittitur to $50,000 or a new trial, and Travers accepted the remittitur and thus the $50,000 amount. FSS argues, however, that we must knock down this award still lower to $10,000.

Our review of the award that the District Court chose in ordering remittitur is highly deferential. In reviewing a district court's denial of a motion to set aside a verdict as excessive, we

reverse only for an abuse of discretion. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435 (1996); Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989). "Translating legal damage into money damages is a matter 'peculiarly within a jury's ken,' especially in cases involving intangible, non-economic losses," and "[w]e will find an abuse of discretion only if the jury's verdict exceeds 'any rational appraisal or estimate of the damages that could be based on the evidence before the jury.'" Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 9 (1st Cir. 2002) (quoting Smith v. Kmart Corp., 177 F.3d 19, 29-30 (1st Cir. 1999)).

And where, as here, the defendant seeks to prune the jury award further after "the trial court already has invoked its discretion in granting a remittitur, the scope of review is even narrower than usual." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 724 (1st Cir. 1994) (original alterations omitted) (quoting Ruiz v. Gonzalez Caraballo, 929 F.2d 31, 34 (1st Cir. 1991)). "Once a verdict has been trimmed and reshaped at the hands of the trial judge, an assault on the remaining amount calls upon the court of appeals not merely to grade the essay, but to grade the teacher's grading of the essay." Id. (original alterations omitted) (quoting Ruiz, 929 F.2d at 34). With that in mind, when we review an accepted order of remittitur for excessiveness, "[f]urther relief is not warranted unless the award, as remitted,

remains 'so extravagant as to shock the appellate conscience.'" Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 32 (1st Cir. 2012) (applying this standard of review to both state and federal claims).

In contending that the evidence did not support even the reduced emotional-distress damages award, FSS relies on the Massachusetts standard for emotional-distress awards. See Stonehill College v. Mass. Comm'n Against Discrimination, 808 N.E.2d 205, 225 (Mass. 2004) (stating that emotional-distress awards "should be fair and reasonable, and proportionate to the distress suffered" and identifying relevant factors in fashioning an award such as "(1) the nature and character of the alleged harm; (2) the severity of the harm; (3) the length of time the complainant has suffered and reasonably expects to suffer; and (4) whether the complainant has attempted to mitigate the harm"). And in arguing that further remittitur is required under this standard, FSS relies on Franceschi v. Hospital General San Carlos, Inc., 420 F.3d 1, 5 (1st Cir. 2005).

But Franceschi held only that a district court did not abuse its discretion when it ordered remittitur of emotional-distress damages from $200,000 to $10,000 in a garden-variety commercial dispute. Franceschi says nothing about whether a district court abuses its discretion in ordering remittitur down to $50,000, but not less, in a case of this sort.

Here, there was testimony about the emotional impact on Travers of FSS's firing him for his efforts to recover in court for other alleged wrongs of FSS. Specifically, Travers testified that when he was eventually fired "[i]t hurt a lot" because he "loved that job," and that he "put in a lot of time" and "prided [him]self in . . . working there, and for so long, too." He further testified that, despite his lack of education and low-income upbringing, this job allowed him to "support [his] kids" -- and that when he lost the job "it was embarrassing" and "hard to explain" to people, such as his sick mother.[8]

Thus, Travers testified that, after the firing, he was "depressed," "didn't want to take [his] son out" or "do any of the things [he] usually did," and "didn't want to get up in the morning some days." He also testified that the stress of trying to pick up more shifts at other jobs "was a little bit hard[] on [his] family life," and that it especially led to more fights with his girlfriend. And, according to Travers's girlfriend, this

---

[8] Travers did testify that his mother had Alzheimer's and that he was taking care of her during this time. FSS argues this shows Travers's depression was caused by circumstances independent of his termination. But the testimony does not compel that conclusion. The testimony would support a reasonable jury's conclusion that Travers's depression resulted primarily from being fired. Most of the testimony about the manifestations of his depression concerned the effect losing his job had on him.

depressed mood persisted for "a couple of months, three, four, five months."[9]

As a result of this testimony, Franceschi provides no basis for finding error in this case. Nor does the other case on which FSS places great weight, DeRoche v. Massachusetts Commission Against Discrimination, 848 N.E.2d 1197, 1203 (Mass. 2006). There, the Supreme Judicial Court found the evidence to be insufficient to support a $50,000 award for emotional distress. But the Supreme Judicial Court explained in DeRoche that the plaintiff in that case had not introduced evidence linking his emotional distress to the retaliatory act and that "[t]here was no testimony . . . the plaintiff was compelled to curtail his life activities in any way due to stress from the . . . retaliatory action." Id. Here, by contrast, Travers did testify that his emotional distress stemmed from the retaliatory firing. Travers and his girlfriend also testified about the impact his emotional distress had on his family and daily activities, including his relationship with his girlfriend and his child and his ability to get out of bed.

---

[9] Travers's girlfriend also testified that Travers's termination "impact[ed] him very dramatically": he used to "like[] to do things with [his family]," but after his termination "everything change[d]." He "didn't enjoy nothing with [the family] anymore" and became "nasty" such that she had to "shut the door and leave him alone." And, the girlfriend testified, Travers went from always playing with his son after work to not wanting to even get out of bed.

In sum, FSS cites no precedent that leads us to conclude that the District Court abused its discretion by knocking the award down only as far as it did, and not still further. And while the evidence of emotional distress was not particularly strong in this case,[10] it was not so lacking that the reduced award of $50,000 shocks the appellate conscience. See Trainor, 699 F.3d at 32. Accordingly, we affirm the emotional-distress damages award set forth in the order of remittitur and accepted by Travers.

**E.**

The last of FSS's challenges concerns the District Court order that granted Travers $176,185 in attorney's fees and $7,398.45 in costs. See Mass. Gen. Laws ch. 149, § 150. FSS argues for a fee reduction because Travers's attorney allegedly engaged in misconduct during the trial.

FSS rightly observes that "[i]t is well settled in this circuit that the district court has the duty and responsibility to supervise the conduct of attorneys who appear before it, and

---

[10] FSS supports its argument for further remittitur by noting that Travers presented no expert testimony regarding his emotional distress. But "expert testimony . . . is useful but not essential to support an award of emotional distress damages." Boston Pub. Health Comm'n v. Mass. Comm'n Against Discrimination, 854 N.E.2d 111, 117 (Mass. App. Ct. 2006); see also Molloy v. Blanchard, 115 F.3d 86, 93 (1st Cir. 1997) (concluding, for federal claim, that expert testimony on emotional distress is not required where lay testimony is "within the common knowledge and experience of the layperson"). And here the lack of expert testimony does not lead us to conclude the District Court abused its discretion in declining to order further remittitur.

that . . . [d]enial of attorneys' fees may be a proper sanction" for attorney misconduct. Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 94, 97 (1st Cir. 1988); see also Wong v. Luu, 34 N.E.3d 35, 45 (Mass. 2015) (holding that "[t]he inherent powers necessary to preserve the court's authority to accomplish justice include the power to sanction an attorney" for misconduct by assessing fees). But we review "the district court's [attorney conduct] supervisory rulings under an 'abuse of discretion' standard" when determining whether fees should be offset for attorney misconduct, Culebras Enters. Corp., 846 F.2d at 97; see also Wong, 34 N.E.3d at 46, and we conclude that, under this deferential standard, the District Court did not abuse its discretion in concluding that there was no attorney misconduct that required a reduction of the attorney's fees award.

The first of the three alleged examples of attorney misconduct that FSS identifies as a basis for reducing the award on appeal concerns the closing arguments by Travers's counsel. FSS contends she inappropriately argued that the jury should draw a negative inference from FSS's failure to locate or subpoena the woman who complained that Travers solicited a tip from her. But the District Court characterized these statements as typical over-zealousness -- not bad-faith acts. And we can see no reason to conclude that the District Court abused its discretion in so finding.

FSS also points to Travers's testimony about Nichols in seeking to reduce the award.  FSS contends that Travers's counsel knew the testimony was inadmissible but sought to admit it anyway.  But the District Court disagreed, and we do not think the District Court abused its discretion in so deciding.  In fact, the District Court itself appeared to view the evidentiary issue as close, as it initially declined to strike the testimony before then reaching the opposite conclusion after trial.

Finally, FSS points to one aspect of Travers's counsel's line of questioning of Nabil Agba, the former FSS skycap supervisor.  Travers's counsel asked Agba whether he had ever heard that Lisa Varotsis, the general manager in Boston, was considering giving Travers his job back.  FSS argues that Travers's counsel was thus suggesting to the jury that FSS had made a settlement offer, even though Federal Rule of Evidence 408(a) restricts the admission of settlement offers.  But while the District Court struck certain parts of the testimony Agba provided in response to this line of questioning, the District Court also ruled that Rule 408(a) was beside the point.  The District Court found that there was no evidence that Varotsis ever sent or saw a settlement offer, and thus no ground for concluding that the counsel was seeking to do an end run around the rule by asking the questions she did.  FSS points to nothing that shows the District Court abused its

- 33 -

discretion in so finding and thus to nothing that shows counsel did engage in misconduct in seeking to admit the testimony.

For these reasons, we affirm the District Court's decision not to reduce or eliminate the attorney's fee award for alleged attorney misconduct.[11]

**III.**

We now turn to Travers's cross-appeal. Travers presents three challenges to the District Court's handling of the case. He argues that the District Court erred first in entirely eliminating and not trebling front-pay damages, next in failing to treble the $50,000 emotional-distress award, and finally in denying prejudgment interest. But before taking up each contention, we note that FSS argues that we may not review any of them. And that is because FSS contends that Travers accepted the District Court's offer of remittitur in order to avoid a new trial.

In making this threshold argument, FSS points to the Supreme Court's opinion in Donovan v. Penn Shipping Co., Inc., 429 U.S. 648, 649 (1977), which held that "a plaintiff cannot appeal the propriety of a remittitur order to which he has agreed." But

_____

[11] FSS also argues the fees and costs award should be reduced to zero because Travers under-reported his tips to FSS during his employment. But we agree with the District Court, which concluded that "[w]hile Travers may have created future complications for himself with the Internal Revenue Service . . . , there is no authority that I am aware of (and none is cited) that would punish the lawyer for the tax defalcations of her client in a case that had nothing to do with tax issues . . . ."

- 34 -

as we will explain in the course of addressing Travers's challenges, each one may be resolved either independently of, or notwithstanding the application of, the Donovan rule.

**A.**

Travers argues first that the District Court abused its discretion when it ruled that the jury's $450,000 front-pay award was "based wholly on speculation" and thus must be rejected in its entirety. Before addressing the merits of that contention, though, we must address FSS's argument that Travers's acceptance of remittitur stands in the way.

The reason that FSS is wrong on this point is simple. Remittitur must be accepted in order to be effective. See Mejias-Quiros v. Maxxam Prop. Corp., 108 F.3d 425, 429 (1st Cir. 1997) (remanding "for a new trial on medical costs unless Mejías accepts a remittitur"). But the record reveals that Travers never accepted the elimination of the front-pay award and that the District Court then separately rejected the front-pay award as a matter of law because it was too speculative.

Specifically, in addressing FSS's motion for a new trial, the District Court did rule that it would grant the motion if the "plaintiff reject[s] a remittitur of damages." The District Court then listed, alongside a reduction in emotional-distress damages, the complete elimination of front-pay damages. Travers responded by accepting remittitur. But in doing so, Travers

clearly accepted the reduction of the emotional-distress damages but characterized the elimination of front pay as a partial judgment as a matter of law that Travers expressly neither accepted nor rejected. See Docket Entry No. 174. Then, in the course of denying FSS's motion for reconsideration, the District Court announced that it stood by "its decision to eliminate the front[-]pay award of $450,000 altogether and to order a remittitur of the $400,000 award of emotional-distress damages to $50,000 (which plaintiff has accepted)." Docket Entry No. 184 at n.1. The District Court thus apparently acknowledged that Travers had accepted remittitur as to the emotional-distress damages alone and that the court was entering a separate judgment rejecting the front-pay award as a matter of law.

Against this background, we construe the District Court's elimination of front-pay damages as a partial judgment as a matter of law under Federal Rule of Civil Procedure 50. See de Jesus v. Banco Popular de Puerto Rico, 918 F.2d 232, 235 (1st Cir. 1990) ("If the court believed that the jury's verdict was unsupported by the evidence, it could have granted judgment notwithstanding the verdict to defendant. If it believed that the verdict was supportable, but that the jury's award of damages was grossly excessive, it could have fixed a remittitur amount."); see also Hill v. Marshall, 962 F.2d 1209, 1217 (6th Cir. 1992). And we review a grant of judgment as a matter of law de novo and affirm

- 36 -

only if, taking the evidence in the light most favorable to the non-moving party, no reasonable jury would conclude that there could be a front-pay award in this case. See Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 316 (1st Cir. 1999) (discussing the Rule 50 standard).

Under both state and federal law, front-pay awards, like all damages awards, "may not be determined by speculation or guess, must be causally related to the defendant's wrongdoing, and . . . should not . . . ma[k]e [the plaintiff] more than whole." Conway v. Electro Switch Corp., 523 N.E.2d 255, 257 (Mass. 1988) (citations omitted); see also Powers v. Grinnell Corp., 915 F.2d 34, 43 (1st Cir. 1990) (front-pay award should not be "too speculative"). Still, some level of uncertainty regarding the future is inevitable and so "[m]ere uncertainty" does not bar front-pay damages. Conway, 523 N.E.2d at 257; see also Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 31 (1st Cir. 2012) (observing that "crafting a front pay award necessarily entails some degree of [permissible] speculation"). Finally, front-pay damages, as an award for future damages, "must be reduced to present value" to account for the difference in the value of money in the future and the value of money today. Conway, 523 N.E.2d at 257 n.3; see also Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 961 (1st Cir. 1995) (noting that "in calculating damages for front pay, [an expert] correctly chose to discount the amounts representing the

plaintiffs' future wages at an appropriate interest rate in order to determine the present value of the future stream of income to which each plaintiff would have been entitled").

Travers defends the $450,000 jury award by multiplying twenty years of future employment[12] by $25,000 in lost tips per year[13] and then subtracting $50,000 to discount those lost future

---

[12] Travers arrives at this twenty-year figure apparently on the basis of his testimony that, if he had not been fired, he planned on staying "[a]nother 20 years. You know, skycaps work for 20, 30, 40 years at the curb. I don't see me leaving. It was a good job," and on the testimony of other skycaps who testified they had been skycaps for years, including one who testified that he had been a skycap for twenty-nine years by the time of trial.

[13] Travers bases this number on his testimony that he took a new skycap job, after being fired by FSS. He testified that that job resulted in about $100 less in tips per shift and two fewer shifts per week, for a loss of at least $500 per week over a fifty-week work year. And the District Court accepted that Travers had estimated in his testimony that he would lose about $25,000 per year as a result of being fired.

We note that Travers also testified that he was able to somewhat increase his hours and hourly wage at yet another job after being fired by FSS. The increase in hours, however, was only temporary, and at the time of trial Travers testified that he was working within the same range of hours per week (18 to 20) on this other job as he was before being fired (15 to 20), with a modest increase in his hourly rate (from $17 to $20.75). In defending against Travers's cross-appeal on the front-pay issue, FSS does not argue that Travers's slightly increased earnings from this other job undermine the estimation of $25,000 in losses per year or contribute to the speculative nature of the original front-pay award. And, in any event, we note that a calculation using Travers's highest estimation of his hours per week at this job before being fired (20) and his lowest estimation of his hours per week at the same job after FSS fired him (18), even after accounting for the increase in hourly wages, shows only a modest impact of $1,675 on his yearly earnings, assuming a fifty-week work year. Given that Travers's loss estimation of $25,000 per year was based on the lower end of the tips per day that Travers estimated earning and did not include his $2.63 hourly wage, we

earnings to present value. We agree with the District Court that awarding the full projected loss for the full twenty-year term Travers asserted he wanted to work would go beyond acceptable uncertainty and constitute unsupported speculation.

The Supreme Judicial Court has upheld larger awards of front pay over similarly long time horizons, but it has done so in cases involving considerably more detail about the likelihood of future earnings than was established here. See, e.g., Haddad v. Wal-Mart Stores, Inc., 914 N.E.2d 59, 69-72 (Mass. 2009) (upholding $733,307 award for nineteen years of front pay, where expert testified about wage difference between old and new jobs, difficulty finding a new job with a similar salary to the old job, likely tenure at employer based on excellent work reviews, remaining time until retirement, and present-value discount calculations); see also Kelley v. Airborne Freight Corp., 140 F.3d 335, 355-56 (1st Cir. 1998) (upholding under Massachusetts law a $1 million, fourteen-year front-pay award, a "hotly contested issue at trial," based on plaintiff's assertion he would work until sixty-five, the six-year proximity to his being fully vested in pension plan, and expert evidence from both sides regarding difficulty finding a better job). In fact, Travers does not

conclude that (at least absent any argument to the contrary) whatever impact Travers's increased earnings at his second job had does not affect our analysis here.

identify a single Massachusetts case that supports upholding a $450,000 award over a twenty-year time horizon based only on the plaintiff's testimony that he desired to work another twenty years, that others in that position at the company had similarly long tenures, and his testimony about current lost income. Travers cites Weber v. Community Teamwork, Inc., 752 N.E.2d 700 (Mass. 2001), as an example of the Supreme Judicial Court upholding a large front-pay award based on a fifteen-year period of assumed continued employment. But there, the court expressly reserved judgment on the sufficiency of the evidence underlying that award. Id. at 718. Accordingly, we agree with the District Court that the $450,000 front-pay award was too speculative to stand.[14]

But the District Court did not merely reject a $450,000 front-pay award. The District Court ordered the complete elimination of front-pay damages, notwithstanding the evidence of the losses Travers testified that he would sustain going forward and notwithstanding his testimony that he had intended to stay in

---

[14] Travers cites both federal and state cases for the general standard of how speculative a jury award may be before being struck as a matter of law under both federal and state law. But he relies primarily on Massachusetts cases -- while citing some non-Massachusetts state cases as persuasive authority -- in arguing that the application of that standard in this case should have resulted in leaving the jury's front-pay award unchanged. Accordingly, we have considered only Massachusetts law in concluding that the District Court was warranted in rejecting as a matter of law the full amount of the front-pay award in this case.

his job at FSS had he not been fired.  That evidence, however, was sufficient to permit a reasonable jury to award some front-pay damages greater than zero.  See Handrahan v. Red Roof Inns, Inc., 680 N.E.2d 568, 577 (Mass. App. Ct. 1997) (finding excessive a $487,800 front-pay award over thirty years based on self-reported intention of employee but remanding for recomputation, not elimination, of front pay); see also Trainor, 699 F.3d at 31 (affirming front-pay award, at least partially under federal law, based on estimation of loss and plaintiff's testimony that he would continue to work for three years).  Accordingly, we vacate the District Court's order eliminating the jury's front-pay award and remand for the District Court to consider the issue anew.

## B.

Travers next contends that the District Court erred in not trebling the remitted emotional-distress damages award of $50,000 on the basis of a Massachusetts statute.[15]  See Mass. Gen. Laws ch. 149, § 150.  That statute provides that an employee, like Travers, may bring a suit "for any damages incurred, and for any

---

[15] The damages Travers seeks to treble under state law are based on both federal and state claims and the damages were not apportioned between them.  But "[w]hen federal and state claims overlap, the plaintiff may choose to be awarded damages based on state law if that law offers a more generous outcome than federal law," Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 146 (1st Cir. 2009).  FSS makes no argument challenging Travers's right to seek trebling under state law notwithstanding that the damages rely partially on a federal claim.

lost wages and other benefits" and that, if the plaintiff prevails, the plaintiff "shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits." Id. Travers contends that this statute applies to the emotional-distress damages because, although he acknowledges that they are not "lost wages," damages compensating for emotional distress are an "other benefit[]" of employment.

We need not decide whether, as FSS contends, that -- in consequence of Donovan -- Travers's acceptance of remittitur precludes him from seeking the trebling of these damages. And that is because we find no basis for concluding that, under Massachusetts General Laws ch. 149, § 150, payment of damages for emotional distress is a "benefit[]" of employment.

Travers cites no case law or legislative history indicating that the Massachusetts legislature had in mind the counterintuitive meaning that he assigns on appeal to the word "benefit[]," and we have found none. Travers cites cases that interpret other Massachusetts statutes that make emotional-distress damages subject to trebling. But those statutes all permit trebling for "damages" -- a broadly encompassing term that rather clearly includes emotional-distress damages -- rather than limited categories of damages that do not generally include emotional-distress damages plus "other benefits." See, e.g., Mass. Gen. Laws ch. 93A, § 9(3A). In fact, the contrast between

the use of the word "damages" in those statutes and "benefit[]" in this one highlights the problem with Travers's proposed reading of this statute.

Thus we, like the District Court, do not believe the Massachusetts state courts would conclude that emotional-distress damages are subject to trebling under ch. 149, § 150.[16]

## c.

Finally, relying on a Massachusetts statute, Travers seeks prejudgment interest on the $90,000, pre-trebling portion of the back-pay award and on the award of emotional-distress damages. That law provides: "In any action in which a verdict is rendered . . . for pecuniary damages for personal injuries to the plaintiff or for consequential damages . . . there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the

---

[16] Travers also argues that the District Court erred by refusing to treble the front-pay award. But we decline to reach this question of state law. The District Court eliminated the front-pay award entirely and has not yet had an opportunity to grant or reject on the merits a motion to treble front pay. Should a remitted front-pay award result on remand, we leave it to the parties to address and the District Court to decide whether front pay qualifies for trebling under the Massachusetts statute as "any lost wages and other benefits." See Mass. Gen. Laws ch. 149, § 150.

verdict or finding beyond the maximum liability imposed by law." Mass. Gen. Laws ch. 231, § 6B (emphasis added).[17]

As a threshold matter, FSS argues, in perfunctory fashion, that Travers may not raise this issue to us because he accepted remittitur. But we conclude that Donovan is no obstacle to our review of Travers's claim for prejudgment interest on the back-pay award and we also conclude that Travers's claim for prejudgment interest on the emotional-distress damages award fails for reasons independent of the Donovan bar. For reasons we will give below, the disposition of Travers's claim for prejudgment interest on the back-pay award depends on the resolution of a close question of Massachusetts law, and so we certify that question to the Massachusetts Supreme Judicial Court. Finally, we conclude that the claim for prejudgment interest on the emotional-distress

---

[17] FSS does not argue that this statute has no application to the Massachusetts wage and tips law by virtue of that law being an employment law. And we note that, in any event, the Massachusetts Court of Appeals has applied this statute to claims of unlawful employment retaliation under Massachusetts' statutory employment law. See Salvi v. Suffolk Cty. Sheriff's Dep't, 855 N.E.2d 777, 788 (Mass. App. Ct. 2006); see also Blockel v. J.C. Penney Co., 337 F.3d 17, 29 & n.4 (1st Cir. 2003) (same). Finally, "[s]tate law customarily governs prejudgment interest determinations on state law claims." Blockel, 337 F.3d at 29. Although Travers seeks prejudgment interest here under state law on an unapportioned award made under both a federal and state claim, we have explained before that "[w]hen federal and state claims overlap, the plaintiff may choose to be awarded damages based on state law if that law offers a more generous outcome than federal law." Tobin, 553 F.3d at 146. FSS makes no argument that Travers may not seek prejudgment interest under state law due to the underlying federal claim.

damages was not properly presented in Travers's motion for prejudgment interest below.

The record reveals that Travers, in accepting remittitur, did not waive his claim for prejudgment interest on the back-pay award.[18] When Travers asked the District Court below to award prejudgment interest, Mass. Gen. Laws ch. 231, § 6B, the District Court concluded that it "d[id] not need to decide" that issue because it did not yet know whether Travers would accept remittitur or instead opt for a new trial. Travers then accepted remittitur, but he did not expressly waive his claim for prejudgment interest in so accepting. Indeed, the category of damages for which Travers seeks prejudgment interest -- back pay -- was not even reduced in the order of remittitur or a new trial.

Moreover, after Travers accepted remittitur and the question of prejudgment interest on the new award became relevant, Travers renewed his request for prejudgment interest. The District Court then denied the request on the merits and with no mention of

---

[18] Travers waived any claim to prejudgment interest on front pay. In his first motion for prejudgment interest, he expressly stated that he "does not seek prejudgment interest on his award of front pay," and, perhaps to explain his decision, he cited Salvi v. Suffolk County Sheriff's Department, 855 N.E.2d 777, 788 (Mass. App. Ct. 2006) ("We conclude that prejudgment interest may not be added to an award of damages for lost future earnings and benefits." (original alterations omitted) (quoting Conway, 523 N.E.2d at 390-91)).

the claim to prejudgment interest having been waived by Travers's earlier acceptance of remittitur as to a different category of damages. Given this record, we decline to conclude that FSS's bare invocation of Donovan suffices to provide a ground for preventing Travers from seeking prejudgment interest on the back-pay award. See Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Turning to the prejudgment-interest statute itself, Travers argues that its plain text makes prejudgment interest mandatory because of the word "shall" and that the District Court therefore had to award prejudgment interest on the back-pay award. FSS, in reply, notes that Massachusetts revised the trebling provision applicable to the back-pay award, Mass. Gen. Laws ch. 149, § 150 (§ 150), in 2008 to make trebling mandatory rather than discretionary and to characterize treble damages under § 150 as "liquidated damages." FSS argues that, through this revision, the Massachusetts legislature necessarily expressed its intent that these treble damages compensate for the loss due to delay that prejudgment interest otherwise would provide for and thus (presumably) that the Massachusetts mandatory treble-damages

statute displace the Massachusetts mandatory prejudgment-interest statute in cases like this one.[19]

Thus, we must decide whether the present treble-damages statute partially repealed the prejudgment-interest statute as to cases in which a party has been awarded treble damages under the former and is eligible for prejudgment interest under the latter. Rather than resolve this question ourselves, however, we certify the question to the Massachusetts Supreme Judicial Court (SJC) pursuant to Mass. S.J.C. Rule 1:03, as the question is determinative of Travers's demand for prejudgment interest on his back-pay award, and, for the reasons that follow, the "course [the] state court[] would take is [not] reasonably clear" here, given the absence of controlling precedent and the "close and difficult legal issues" involved. Easthampton Sav. Bank v. City of Springfield, 736 F.3d 46, 51 (1st Cir. 2013).

The key issue is whether the 2008 amendment was intended to signal, through the transformation of § 150 from a discretionary

_____

[19] FSS contends that prejudgment interest under Mass. Gen. Laws ch. 231, § 6B may not be awarded on a base amount whenever treble damages under § 150 are awarded on that amount. FSS thus makes no argument that, to the extent back-pay damages were awarded pursuant to the federal claim, our decision in Linn v. Andover Newton Theological School, 874 F.2d 1 (1st Cir. 1989), bars the recovery of prejudgment interest on the back-pay award. See id. at 7-8 (barring prejudgment interest where liquidated damages on back-pay award arose from federal claim and prejudgment interest on back-pay award arose from state claim). We consequently treat any argument based on Linn as waived. See Zannino, 895 F.2d at 17.

to a mandatory trebling regime and the inclusion of the words "as liquidated damages," that treble damages serve a compensatory purpose rather than a purely punitive one. If so, then it would seem improper to award prejudgment interest on top of the damages awarded under § 150 in light of the substantial precedent that indicates that compensatory treble damages cover the value of prejudgment interest. See, e.g., Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707, 715 (1945) (stating that liquidated damages under the FLSA "constitute[] compensation for the retention of a workman's pay [as a result of "the delay in payment of sums due under the Act"] which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages" and therefore duplicate the value of prejudgment interest); Matamoros v. Starbucks Corp., 699 F.3d 129, 140 (1st Cir. 2012) (stating that, within the context of the FLSA, "liquidated damages [awarded under § 150] are not punitive damages"); Powers v. Grinnell Corp., 915 F.2d 34, 41 (1st Cir. 1990) ("[A]n award of liquidated damages 'usually will be far greater than would be necessary to compensate for delay -- far greater, that is, than an award of prejudgment interest.'" (citation omitted)); Feygina v. Hallmark Health System, Inc., No. MICV2011-03449, 2013 WL 3776929, at *6-8 (Mass. Super. July 12, 2013) (collecting cases and noting that § 150 "compensate[s] . . . for all direct and consequential

damages," including "all harm caused by [the] employer's unlawful delay in paying all wages owed to [the employee]").

A reason to conclude that the 2008 amendment changed the nature of treble damages from punitive to compensatory is that the Massachusetts legislature may have intended such a transformation to help avoid a constitutional concern raised by making trebling mandatory rather than discretionary. This interpretation draws support from Massachusetts precedent that indicates that, to comport with the federal guarantee of due process, punitive treble damages may be awarded only if there is a finding of heightened culpability on the part of the defendant. See, e.g., Wiedmann v. The Bradford Group, Inc., 831 N.E.2d 304, 313 (Mass. 2005), superseded by statute on other grounds, Mass. Gen. Laws ch. 149, § 150 ("[T]reble damages are punitive in nature, allowed only where authorized by statute, and appropriate where conduct is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." (quotation marks and citation omitted)); Goodrow v. Lane Bryant, Inc., 732 N.E.2d 289 (Mass. 2000) ("To [award punitive damages] absent evidence of heightened culpability would very likely constitute an 'arbitrary or irrational deprivation[] of property,' and thus would be constitutionally impermissible." (citation omitted)). And such a reading of the purpose of the 2008 amendment also would help explain the addition of the words "as liquidated damages." That

addition would then serve as an indication that the legislature intended for the treble damages to be compensatory rather than punitive.

Consistent with that conclusion, in Matamoros v. Starbucks Corp., we did characterize the amended version of § 150 as providing for liquidated damages that were compensatory rather than punitive in concluding that the new mandatory trebling statute -- which provides for the award of treble damages without a finding of heightened culpability -- did not raise due process concerns. See 699 F.3d 129, 140 (1st Cir. 2012) ("Because an award of treble damages pursuant to the current version of [§ 150] is neither an award of punitive damages nor fairly analogous to such an award, [defendant's] due process concerns are misplaced."). And we note that the only Massachusetts precedent that addresses this specific question -- whether the treble-damages statute, as amended, displaced the mandatory prejudgment-interest statute -- directly follows this course of reasoning. See Feygina, 2013 WL 3776929, at *6-8.

But were we to construe § 150 in this way, we would be, in effect, countenancing an implied repeal of the prejudgment-interest statute. The bar to finding an implied repeal of a preexisting statute, however, is high. Under Massachusetts law, "[a] statute is not to be deemed to repeal or supersede a prior statute in whole or in part in the absence of express words to

that effect or of clear implication."  Com. v. Harris, 825 N.E.2d 58, 67 (Mass. 2005) (alteration in original) (quoting Com. v. Hayes, 362 N.E.2d 905, 909 (Mass. 1977)).  That is because "it is by no means clear that, as between two successive acts whose literal interpretations clash, the earlier must yield to the latter.  Indeed, the later statute is often intended to defer to the earlier."  Hayes, 362 N.E.2d at 909 (alteration in original) (citation omitted).  Where the Massachusetts courts "encounter legislative silence on how . . . two statutes should relate to each other," therefore, they seek to give effect to both "to the greatest extent possible."  Harris, 825 N.E.2d at 67.

Yet here the "express words" of § 150, as amended, do not make any reference to the prejudgment-interest statute or to its repeal.  Nor is there any legislative history that provides meaningful guidance on this question.  And while we did characterize the treble damages available under the present version of § 150 as compensatory in addressing the federal due process claim presented in Matamoros, see Matamoros, 699 F.3d at 140, a recent Massachusetts Court of Appeals case -- which post-dates Matamoros -- describes these treble damages as punitive and thus in terms that arguably would raise no double recovery concern. See Weber v. Coast to Coast Medical, Inc., 985 N.E.2d 1212, 1216 n.7 (Mass. App. Ct. 2013) (stating in the context of § 150 that "an award of treble damages, whether in an exercise of discretion

or mandatorily, is nevertheless punitive"); see also Blake v. CRNC Operating LLC, No. 15-ADMS-10011, 2015 WL 5783645, at *1 n.4.

To be sure, in Brooklyn Savings Bank v. O'Neil, 324 U.S. 697 (1945), the Supreme Court considered the propriety of ordering prejudgment interest on a back-pay award where the applicable federal statute contained a liquidated-damages provision that required the doubling of that award. And the Court concluded that the liquidated damages were intended to compensate for the obscure costs that arise from the delay in sums due under the federal act and thus did include the value of prejudgment interest. See Brooklyn Sav. Bank, 324 U.S. at 714-15. For that reason, the Court held that awarding prejudgment interest in that case was improper. See id.

But Brooklyn was not interpreting -- as we must -- the potential conflict between a statute mandating treble damages and a statute mandating prejudgment interest. Indeed, Brooklyn does not seem to have involved a prejudgment-interest statute at all.[20]

---

[20] If prejudgment interest were to have been available in Brooklyn, such interest would only have been awarded as a result of a traditional common-law remedial doctrine making prejudgment interest available for compensatory damages under claims arising out of federal law where prejudgment interest would be consonant with "an appraisal of the congressional purpose in imposing [the obligation]" and where there was no expression of "an unequivocal congressional purpose that the obligation shall not bear interest." Rodgers v. United States, 332 U.S. 371, 373-74 (1947) (characterizing Brooklyn as a case involving this common-law remedial doctrine and making no mention of a prejudgment-interest statute).

Thus, unlike in Brooklyn, we are faced with a question of state law and two mandatory state statutes -- one for liquidating damages and another for awarding prejudgment interest -- neither of which purport to make an exception for the other.

In sum, a state legislature drafting a liquidated-damages provision on a clean slate might well intend to compensate for the loss due to delay in recovery of a judgment and thereby displace an implied common-law remedy of prejudgment interest. See id. It is less clear to us, however, that the Massachusetts legislature did so intend in amending this treble-damages statute, which was altered in the shadow of an otherwise applicable mandatory prejudgment-interest statute. Cf. Hutka v. Sisters of Providence in Wash., 102 P.3d 947, 960 n.52 (Alaska 2004) (noting Alaska does not follow Brooklyn under state law). And that is particularly so given that existing law at the time of the 2008 amendment permitted the application of both treble damages and prejudgment interest to a damages award. See DeSantis v. Com. Energy Sys., 864 N.E.2d 1211, 1219-22 (Mass. App. Ct. 2007) (affirming award of treble damages under § 150 and award of prejudgment interest on award of back-pay damages prior to the 2008 amendment). Indeed, under an implied-repeal view, the 2008 amendment would have the odd effect of reducing the amount of damages awarded in the cases where the defendant's conduct is most egregious.

- 53 -

Thus, due to the lack of clarity of the statute and the absence of controlling precedent, as well as the potentially far-reaching impact that the resolution of this question would have, Easthampton Sav. Bank, 736 F.3d at 52-53, we conclude that certification to the SJC is appropriate to determine whether Travers may be awarded prejudgment interest on his award of back-pay damages, in conjunction with his award of liquidated damages on the back-pay damages.  For these reasons, we certify the following question to the SJC pursuant to its Rule 1:03:

> Did Mass. Gen. Laws ch. 149, § 150 impliedly repeal Mass. Gen. Laws ch. 231, § 6B as to cases in which a party was awarded liquidated damages under § 150 and is eligible for prejudgment interest under § 6B, such that the award of prejudgment interest is precluded?

We would further welcome the advice of the SJC on any other relevant aspect of Massachusetts law that it believes would aid in resolution of this dispute.

As noted above, Travers also argues that he should receive prejudgment interest on the $50,000 emotional-distress award, but this claim fails, notwithstanding our view of how the SJC would apply the prejudgment-interest statute.  And that is because of Travers's failure to raise this issue below.

Travers asked for prejudgment interest on both the back-pay and emotional-distress awards in his first motion, Docket Entry No. 135, at 2, which the District Court did not decide on the merits.  In his renewed motion for prejudgment interest,

- 54 -

however, Travers asked only for prejudgment interest on the back-pay award.  See Docket Entry No. 195, at 13.  It was this renewed motion that the District Court denied and that we are asked to review on appeal.  Under these circumstances, we think Travers came close to voluntarily waiving his right to prejudgment interest on the emotional-distress award.  But even treating his failure as forfeiture, we conclude that the District Court did not plainly err.

Assuming it would be clear and obvious error affecting Travers's substantial rights not to award prejudgment interest under the Massachusetts prejudgment-interest statute, Travers has not met his burden of showing that the error resulted in a miscarriage of justice.  Travers agreed to remit all but $50,000 of the emotional-distress damages award, and it is unclear if, in doing so, he was also electing to accept that remitted award as inclusive of the prejudgment interest that he had requested earlier on that award.  That Travers intended such an all-inclusive election is made somewhat more likely by the fact that Travers did not ask for prejudgment interest on the emotional-distress award in his renewed motion, after accepting remittitur, whereas he had asked for such prejudgment interest earlier.  And Travers makes no argument to us on appeal for why affirming the denial of prejudgment interest on the emotional-distress award would result in a miscarriage of justice in his case.  As "it is rare indeed

for a panel to find plain error in a civil case," <u>Chestnut</u>, 305 F.3d at 20, we conclude, for these reasons, that this case is not that rare case.

**IV.**

For these reasons, we **<u>AFFIRM</u>** the District Court's denial of FSS's motions for judgment as a matter of law, the District Court's denial of FSS's motion for a new trial, the District Court's denial of FSS's motion to further reduce the jury's award of back pay, the District Court's remittitur order on emotional-distress damages, and the District Court's award of attorney's fees and costs to Travers. We also **<u>AFFIRM</u>** the District Court's decision not to treble the remitted award of emotional-distress damages as well as its decision not to grant prejudgment interest on the emotional-distress damages. But we **<u>VACATE</u>** the District Court's order eliminating front-pay damages and we **<u>REMAND</u>** for further proceedings consistent with this opinion.

The Clerk of this court is directed to forward to the SJC, under the official seal of this court, a copy of the certified question and our opinion in this case, along with copies of the briefs and appendix filed by the parties. We retain jurisdiction over this one issue pending the SJC's response.