# United States Court of Appeals
## For the First Circuit

No. 16-2401

LORI FRANCHINA,

Plaintiff, Appellee,

v.

CITY OF PROVIDENCE,

Defendant, Appellant,

PROVIDENCE FIRE DEPARTMENT;
PROVIDENCE FIREFIGHTERS LOCAL 799,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Kevin F. McHugh, Senior Assistant City Solicitor, with whom
Jeffrey Dana, City Solicitor, and Kathryn M. Sabatini, Associate
City Solicitor, were on brief, for appellant.
John Martin, with whom Benjamin H. Duggan, Kathy Jo Cook, and
KJC Law Firm, LLC were on brief, for appellee.
Mary L. Bonauto and Allison Wright, with GLBTQ Legal Advocates
& Defenders, Ria Tabacco, with American Civil Liberties Union,
Gregory R. Nevins, with Lambda Legal Defense & Education Fund,
Inc., Shannon P. Minter and Christopher Stoll, with National Center
for Lesbian Rights, on brief for American Civil Liberties Union,

American Civil Liberties Union of Rhode Island, GLBTQ Legal Advocates & Defenders, Lambda Legal Defense & Education Fund, Inc. and National Center for Lesbian Rights, amici curiae.

————————————

January 25, 2018

————————————

THOMPSON, **Circuit Judge**.   Sticks and stones may break some bones, but harassment can hurt forever.   "Cunt," "bitch," "lesbo": all are but a smattering of the vile verbal assaults the plaintiff in this gender discrimination case, Lori Franchina, a former lieutenant firefighter, was regularly subjected to by members of the Providence Fire Department ("the Department").   She was also spit on, shoved, and--in one particularly horrifying incident--had the blood and brain matter of a suicide-attempt victim flung at her by a member of her own team.   After an eight-day trial, a jury in the District of Rhode Island concluded that Franchina had been discriminated against on the basis of her gender and retaliated against when she dared protest her treatment.   For her ordeal, she was awarded front pay[1] as well as emotional damages.[2]   The City of Providence ("the City") now appeals, making numerous arguments as to why the jury verdict should be set aside or, in the alternative, why the judge's front pay award should be

---

[1] Front pay awards are essentially awards of future "damages for wages from the date of judgment to some specified date in the future."   Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 953 (1st Cir. 1995).   They serve to "mak[e] victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment."   Powers v. Grinnell Corp., 915 F.2d 34, 42-43 (1st Cir. 1990) (internal quotation marks omitted).   A lot more on that later.

[2] The jury also awarded punitive damages but those were later eliminated.

stricken.  Because we decline to put out flames of the Department's own making, we affirm.

## Getting Our Factual Bearings

We begin, as we nearly always do, by outlining how this case came to be.  Though the City attempts to trivialize the abuse inflicted upon Franchina while working for the Department by giving it short shrift in its brief, we decline to be as pithy in reciting Franchina's plight in order to give context both to the jury's and the district court's ultimate determinations.[3]  In outlining the background in this case, we keep in mind that our recounting of the facts is done "in the light most favorable to the verdict, deferring 'to the jury's discernible resolution of disputed factual issues.'"  Ciolino v. Gikas, 861 F.3d 296, 299 (1st Cir. 2017) (quoting Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010)).

Franchina testified for three days and recalled the following for the jury.  In or about 2002, Franchina was assigned to the North Main Street Fire Station in Providence, Rhode Island. Up until 2006, she experienced neither discrimination nor harassment by members of the Department.  In fact, in her lengthy testimony, Franchina recounted numerous kind-hearted moments

---

[3] Indeed, doing so is especially necessary here where the district judge, in his discretion, imposed the equitable remedy of front pay.

- 4 -

during this timeframe where she felt comradery with her colleagues. She explained, for example, that at the beginning of her career-- as a young female among a workforce consisting primarily of males- -she felt that some members of the Department took her under their wings and shielded her from individuals who sometimes got too drunk or unruly at work events.

Far from worrying about discrimination, Franchina testified that some of her biggest concerns during her early years had to do with Department leadership wanting to promote her too quickly. That her superiors wanted to promote Franchina is unsurprising given her commendable professional record. She was one of only eighty applicants accepted to the Providence Firefighter Academy out of 2,300 who applied her year and, once there, she graduated tenth in her class. Throughout her career her superiors noted that she "did her job . . . the way we expected it to be done" and effused that she was "on her game and knows her stuff." Franchina's Chief also regularly received compliments about her performance. Franchina, however, worried that rising up the ranks too quickly could cause resentment among more senior firefighters and testified that she actively attempted to keep leadership from assigning her to officer roles at the beginning. Nonetheless, Franchina's superiors ultimately ordered that she be promoted from Rescue Technician to Acting Rescue Lieutenant to, eventually, Rescue Lieutenant.

Franchina's woes began in or about 2006 when she was assigned to work a shift with Andre Ferro ("Ferro"), a firefighter with a history of sexually harassing female colleagues in the Department.[4]  During that shift, Franchina and Ferro were assigned to the same rescue vehicle, with Franchina serving as an acting rescue lieutenant, and Ferro assigned to be her rescue tech chauffeur.  That is to say, Ferro was responsible for driving the rescue vehicle and Franchina served as his superior.  Franchina and Ferro had never worked with one another prior to this point, though Franchina was aware of Ferro's dubious reputation with women and was therefore apprehensive about having to spend the shift with him.

Ferro's notoriety was on display within moments of Franchina meeting him.  After arriving at the station for her shift and while pouring herself a cup of coffee, Franchina was immediately approached by Ferro who, without missing a beat, asked

---

[4] This Court is familiar with Ferro.  Over fifteen years ago, we encountered him in a separate Title VII action.  In that case, the City was found to be liable under Title VII for, among other things, comments Ferro made toward the plaintiff, another female firefighter named Julia O'Rourke.  Ferro commented on her breast size (which he referred to as "stacked") and suggested that if she had sex with him she would "never want another man."  O'Rourke v. City of Providence, 235 F.3d 713, 718 (1st Cir. 2001).  Ferro also forced O'Rourke to listen to his musings on different sexual positions he enjoyed and his love of oral sex, played videos of himself having sex with his girlfriend in front of her, and discussed his sexual prowess and stamina.  Id.  Nonetheless, Ferro maintained his employment with the Department in spite of the O'Rourke outcome.

if she was a lesbian.   To repeat, this was their very first encounter.   After Franchina retorted that it was none of his business, Ferro followed up with the statement, "I don't normally like to work with women; but, you know, we like the same thing, so I think we're going to get along."   Franchina testified she was appalled by his comments and as his supervisor, instructed him not to say such things.   She then immediately left for her office to escape him.   Soon thereafter, however, an emergency call came in and Franchina and Ferro were jointly dispatched to respond in their rescue vehicle.

During the emergency run Ferro continued with his inappropriate prattle.  He asked, for example, if Franchina wanted to have children and quickly followed up with, "I could help you with that," implying that he wanted to impregnate her.   So incessant was the unprofessional chatter that Franchina was forced to tell Ferro on multiple occasions to stop talking because she was having difficulty hearing the dispatcher's instructions. Franchina further testified that she refused to engage with Ferro's uncomfortable banter, instead riding in silence or telling him to be quiet as needed.

During the same shift, Franchina and Ferro were also dispatched on a run that took them to the Rhode Island Hospital. When they arrived, two other rescue vehicles were on the scene, meaning that a total of six firefighters were present (two in each

vehicle).  The firefighters entered the hospital in order to pass along reports about their respective transports (patients that had been transported to the hospital) and, after doing so, Franchina and the other firefighters (with the exception of Ferro) waited in a holding area and chatted with one another.  At some point Ferro approached the group and began rubbing his nipples in a circular fashion, leapt up in the air, and screamed at Franchina, "My lesbian lover!  How are you doing?"  Nurses, doctors, patients, and patients' families were all present in the holding room to witness this display.  Franchina testified that she was horrified and felt belittled.  The other firefighters present were similarly appalled.

Later that evening, after returning back to the station, Franchina went to her personal quarters and began changing out of her uniform.  Though she had closed the door, it was not locked. A rule, however, existed in the station requiring that if an officer's door was closed, anyone seeking permission to enter had to first knock three times and wait for the officer to respond. Nevertheless, without knocking, and while Franchina was changing, Ferro opened the door to her room wearing what appeared to be only his boxers, a Providence Fire Department shirt, and socks. Franchina, who was in her undergarments, quickly grabbed a sheet off her bed to cover herself.  When Franchina asked Ferro to leave, he refused.  She asked a second time, and he refused yet again.

Only after telling him to "get the fuck out" of the room did Ferro finally depart.

Franchina never reported this repulsive behavior. She didn't have to. Following the nipple-rubbing incident at the hospital, Chief Curt Varone, a high-level officer with authority over all of the stations within the Department, called her directly because he had "gotten wind" of what had transpired. During the phone call, Chief Varone asked Franchina to recount the details of Ferro's actions. Based on Franchina's explanation, Chief Varone filed a written complaint against Ferro charging him with sexual harassment and exposing him to employment termination.[5] A hearing was scheduled to determine whether Ferro would retain his job.

Once word spread about Ferro's disciplinary proceeding, firefighters in the North Main Street station began to treat Franchina with contempt and disdain. Firefighter Andy McDougal, a subordinate to Franchina, approached her in the kitchen several weeks before Ferro's hearing and, in front of numerous other firefighters, yelled at her and asked, "What are you trying to get him fucking fired?" Although Captain Alan Horton, the top supervisor in the North Main Street station, was present during this exchange, he neither reprimanded McDougal nor reported the incident to Chief Varone.

_____

[5] Ferro was, in fact, ultimately fired in 2007, but, again, was allowed to subsequently return to the Department in 2008.

- 9 -

The day following McDougal's kitchen outburst, McDougal--who was responsible for cooking at the station--also stated to Captain Horton that he would no longer prepare meals for Franchina. Captain Horton, however, overrode McDougal, which angered him. According to Franchina, from that point forward, the meals McDougal prepared for her made her severely ill. Following several bouts of ensuing illness, Franchina, who never had a history of gastrointestinal problems, decided to swap her meal with that of a different rescue tech. After that tech ate Franchina's meal, he, too, became ill and had to go home sick.[6]

Starting in 2006, members of the North Main Street station also began to refer to Franchina using gendered epithets. For example, she was referred to openly as "Frangina," a combination of her last name and the word "vagina," which (as Franchina testified she had seen on the popular website UrbanDictionary.com) is also a slang term used to describe an unshaved vagina. See Frangina, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Frangina (last visited Jan. 25, 2017). Additionally, Franchina explained she heard male firefighters in the station refer to her as a "bitch" with great regularity. "Who does that fucking bitch think she is?"; "I'm not going to help that fucking bitch"; "That bitch can

---

[6] The record does not tell us how this meal preparation debacle was ever resolved.

carry her own stretcher" were common derogatory remarks hurled at Franchina.

The men of the North Main Street station did not limit their harassment of Franchina to verbal attacks. Rather, at one point they began utilizing a group white board in one of the common areas to further taunt her. Twenty-one total insults were written on the board including: "Be careful how you talk to her, she'll bark at you," "You get what you get, bitch," and "Frangina leads Team Lesbo to victory." Franchina testified that she personally heard Captain Peter Spedutti, a thirty-year veteran of the Department, point at the white board and say, "I'll show her." She also later witnessed him boisterously brag to a younger firefighter about what was written on the white board. The list remained up for over fourteen hours. Although Franchina complained to Chief Michael Crawford, a superior officer in the Department, about what was being written about her on the board, the perpetrators were not reprimanded.

Based on trial testimony, Franchina also suggested that the actions of the North Main Street station put the lives of the people of Providence at risk, including, in one instance, that of an unborn child and the child's mother. About a month prior to Franchina leaving the North Main Street station in 2007, Franchina was dispatched to a pre-natal facility in response to a pregnant mother experiencing fetal distress. In order to get oxygen to

both the mother and baby, a device known as a non-rebreather was needed because the fetal heartrate was severely elevated. Firefighter McDougal, who had already been avoiding eye contact with Franchina and who did not want to work with her (or, remember, cook for her), was also on the scene. Though Franchina tasked McDougal with securing the re-breather around the patient's nose and mouth, he continued to let the device slip off, thus preventing oxygen from properly being transported to the patient. Franchina had to order him to get away from the patient so she could properly secure the device herself. Such instances of insubordination with McDougal, Franchina recalled, were common and intentional.

Franchina was eventually transferred in 2007 from the North Main Street station to the Branch Avenue station and, initially, her experiences at Branch Avenue were good. Things, however, went south and her colleagues at that station began to display similar behaviors to those at the North Main Street station. Franchina testified that the beginning of the bad times seemed to coincide with call-back shifts in which McDougal was assigned to work in the Branch Avenue station.[7] During one call-back, McDougal walked into the kitchen where members of the Branch Avenue station were convening (including Franchina) and exclaimed

---

[7] Call-back shifts are additional overtime shifts that firefighters in the Department may pick up for additional compensation.

loudly, "affirmative action's killing this fucking job." An officer who was present did not reprimand him for this outburst. On another occasion, during a shift change, he purposely pushed Franchina into a wall when nobody was looking. Franchina complained about the incident to Chief Al Horton[8] but nothing was done.

Franchina explained at trial that following McDougal's call-backs at the Branch Avenue station, she regularly began to be called "bitch," "cunt," and "Frangina." She also testified that a subordinate flicked her Lieutenant's insignia on her collar and whispered, "I will never take a fucking order from you."

Franchina also testified to the inappropriate behavior that Branch Avenue station firefighters would exhibit on emergency runs to spite her. In one instance, a firefighter purposely failed to put a wheelchair on one of Franchina's rescue vehicles when she was responding to a patient with cerebral palsy who was wheel-chair dependent for transportation. Franchina reported the incident to Chief Horton but the firefighter was not reprimanded. In another run, Franchina and a number of Branch Avenue firefighters responded to a car accident involving two individuals who were severely injured. One of them had been decapped (meaning a portion of his scalp had been severed). Franchina was able to

---

[8] While we referred to Horton as Captain Horton previously, by this point he had been promoted to Chief.

get this victim onto a stretcher and then into a rescue vehicle but, while treating the victim, realized that none of the firefighters at the scene were behind the driver's wheel to transport the victim to the hospital. After requesting a driver numerous times from the firefighters on scene, Franchina was addressed by Lieutenant Anthony Lancellotti who, in a sour tone, barked "You'll get a driver when you get your driver." The car crash victim later died.

During another run, Franchina and several Branch Avenue firefighters--including Lieutenant Robert Jackson, Rescue Technician Paul Tang, and Firefighter Sean McGarty--responded to a suicide-attempt victim who had shot himself in the head. Franchina was the officer in charge at the scene. Franchina ordered Jackson to assist in putting the body of the victim onto a stair chair so that he could be carried downstairs to the rescue vehicle. Jackson, however, refused to comply, folded his arms, and stated, "That's a lot of blood." McGarty was also insubordinate, and refused to comply with Franchina's directive to move the victim to the chair. McGarty quipped, "if he wanted to kill himself, maybe we should just let him." Franchina ordered the men at least four times to move the victim onto the chair. None would comply. Tang, in fact, took the chair and slammed it open, but would not help put the victim in it. Eventually

Franchina had to find a police officer to assist her since her own men remained insubordinate.

Once the suicide-attempt victim was in the rescue vehicle, Tang performed CPR on the victim. The gloves Tang wore became severely encrusted with blood and pieces of brain matter. After Tang completed CPR, he sat upright with his hands at Franchina's eye level. He then removed the gloves, purposely snapping them off in such a way as to fling the bloody debris onto Franchina's face, nose, hair, neck, eyes, ears, and mouth.

Immediately following this incident (and as a result of it), Franchina went out on disability leave for six months' time. She also confidentially reported the incident to Chief Crawford, and though Crawford contacted the City's Equal Employment Opportunity ("EEO") Officer, the complaint form he completed noted that he believed Franchina was "blowing [the incident] out of proportion." The City's EEO officer, however, concluded differently:

> there appears to be AMPLE merit to [Franchina's] claim of MULTIPLE & REPEATED violations of [Providence Fire Department] RULES AND REGULATIONS.

> Even seems plausible that the pervasiveness of this behavior creates a HOSTILE WORK ENVIRONMENT for her. Also seems clear that [the Department] has FAILED to STOP the behavior.

Amended Joint App'x at 1046 (emphasis in original). The EEO officer testified at trial that she was unaware if anyone was ever ultimately disciplined for their actions toward Franchina.

Following her return to the Department after the six-month leave, the abuse from her colleagues continued. At a December 2009 Christmas party in the Firefighter's Union Hall, Franchina was berated by McGarty (we will call this event the "Union Hall Incident"). He screamed obscenities at her, spit as he yelled at her, and, at a whopping 6'6", attempted to use his body to block her from leaving the hall so he could continue his bellowing. He called her a "fucking doughnut," a "fucking zero," and a "fucking loser." Two senior officers, Lieutenant Elliot Murphy and Lieutenant Robert Jackson were both about fifteen to twenty feet away from where this harassment was occurring, yet said nothing. In fact, when Franchina, seeking assistance, called out to Lieutenant Jackson--McGarty's direct supervisor--Jackson responded, "I'm not your fucking baby-sitter" and allowed McGarty's tormenting to continue.

In response to this incident, Franchina sought first a temporary restraining order ("TRO") against McGarty, which a Rhode Island state-court judge granted, and then a preliminary injunction, which was also granted. The injunction specifically restrained McGarty from "interfering with, molesting, harassing, annoying or contacting [Franchina] in any manner, directly or

- 16 -

indirectly." The only exception to this injunctive relief was a carve-out allowing the two to interact with one another "on an emergency call, that is, specifically when [McGarty] is doing a call on behalf of the fire department and he is on the scene." Apart from that narrow exception, the superior court left it up to the Department to prevent Franchina and McGarty from encountering one another. Chief Michael Dillon, Assistant Chief of Operations, subsequently issued an order barring McGarty from working any call-backs in stations that had a rescue unit, thus ensuring that Franchina (as a rescue lieutenant) and McGarty would never interact. Nonetheless, Chief Scott Mello, who was in charge of scheduling, testified that he believed such an order was impossible to enforce and, moreover, that he viewed the order as "more of a suggestion." No surprise, then, that the order was not actually followed and McGarty violated it at least four separate times.

Franchina's final day as an active-duty rescue lieutenant was October 28, 2010. That day, she arrived at the Branch Avenue Station only to discover that McGarty was on duty working there. McGarty and various other firefighters, including Chief Mello (the scheduler discussed above), were on the second-floor landing of the station, talking negatively about Franchina in a raucous manner. Franchina heard them making fun of her and loudly exclaiming, "Do you know who was in the fucking station today? That bitch was in the station." Franchina confronted the

group and then reported the incident to Chief Horton.  Again, no disciplinary action was ever taken against anyone as a result of this incident.

The constant ridicule and harassment Franchina experienced caused her to be placed on injured-on-duty ("IOD") status.  Still, in order to remain an active member of the Department, Franchina was required to perform various administrative tasks at the Branch Avenue Station.  She testified that she performed these tasks "weekly" for a "good portion" of 2011.  The abuse, however, did not stop even when Franchina was classified as IOD.  While at the station, she would hear firefighters make disparaging comments about her such as "[t]he bitch is in the house," and "F that bitch . . . thank God she's not here anymore."

One of the Department chiefs eventually requested that Franchina no longer come into the station.  Thereafter, Franchina remained employed with IOD status (for a total of three more years), but she no longer physically reported in.  On November 30, 2011, Franchina filed a Charge of Discrimination with the Rhode Island Commission for Human Rights ("RICHR") and with the Equal Employment Opportunity Commission ("EEOC").  She officially retired on disability on December 19, 2013, after being diagnosed with severe post-traumatic stress resulting from the numerous work-related incidents that occurred.  She testified that she can

never again work as a rescue lieutenant as a result of her permanent disability, which the City does not contest. By the time Franchina officially retired, she had submitted approximately forty different written statements complaining of harassment, discrimination, and retaliation to higher-ups in the Department.

At trial, numerous individuals besides Franchina testified to the disparities and harassment faced by female employees of the Department. Lieutenant Danielle Masse testified, for example, that women were treated as "less competent" than men and were "spoken to as if they have no authority." She also testified that when women brought issues to the Department's chain of command, leadership generally didn't take the complaints seriously or deal with them in an appropriate way. In fact, she stated that when a woman would voice a grievance, Department leadership often turned the problem around and blamed the female firefighter doing the complaining.

There was also testimony that female employees who dated male firefighters were generally treated better than those who were not intimately involved with their male colleagues. And Chief Varone testified that there were men in the Department who openly treated their female counterparts with contempt. Another firefighter, Lieutenant Andrea Stuckus, explained at trial that she herself was followed into the women's restroom by a drunk male

firefighter who had to be physically removed by other male members of the Department.

At the end of the trial the jury found in favor of Franchina on both her gender-based hostile work environment discrimination claim, as well as her retaliation claim. It also awarded her punitive, emotional, and front pay damages. After judgment was entered for Franchina, the City filed a motion for judgment as a matter of law, a motion for a new trial, and, in the alternative, a motion to amend the judgment (by striking the punitive damages and front pay awards). After a hearing, the district court denied the City's motion for judgment as a matter of law and motion for a new trial. It did, however, strike the punitive damages award after reasoning that 42 U.S.C. § 1981a(b)(1) legally precluded a plaintiff like Franchina from recovering punitive damages from a municipality like the City. Lastly, the district judge denied the City's motion to amend the judgment by striking the jury's front pay award. In doing so, the court stated that it had independently determined, in its equitable discretion, that front pay was an appropriate remedy and thus awarded the same amount that the jury had previously determined was fair. An amended judgment was then entered.

With this background in place, we now turn to the issues presented on appeal, highlighting additional facts when needed to put the claims into proper perspective.

## Analysis

The City appeals from the denial of its motion for judgment as a matter of law, making numerous arguments as to why the decision in this case should not stand. While the core issue on appeal involves the merits of Franchina's sex-discrimination claim, the City complains of other supposed reversible errors--such as timeliness concerns and evidentiary issues--that we will also address. We review the district court's denial of the motion for judgment as a matter of law de novo. Parker v. Gerrish, 547 F.3d 1, 8 (1st Cir. 2008). In doing so, however, we do not "evaluate the credibility of the witnesses or weigh the evidence." Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 75 (1st Cir. 2006). We will reverse "only if reasonable persons could not have reached the conclusion that the jury embraced." Negron-Rivera v. Rivera-Claudio, 204 F.3d 287, 290 (1st Cir. 2000).

### A. Title VII: A Primer

We begin with a brief introduction to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., the anti-discrimination statute upon which Franchina's claims are based. Under that statute, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), or "to limit, segregate, or classify [her] employees . . . in any way which would deprive or tend to deprive

any individual of employment opportunities or otherwise adversely affect [her] status as an employee," 42 U.S.C. § 2000e-2(a)(2), based on a protected characteristic such as sex. The Supreme Court has articulated that, pursuant to that language, plaintiffs may establish a violation of Title VII by demonstrating that an employer required them to work in a hostile or abusive environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (explaining that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment") (internal quotation marks omitted).

Title VII's anti-retaliation provision separately tells us that it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). Because, as we've explained, the term "'oppose' . . . carries its ordinary meaning: to resist or antagonize . . .; to contend against; to confront; resist; withstand," Rodríguez-Vives v. P.R. Firefighters Corps of P.R., 743 F.3d 278, 284 (1st Cir. 2014) (quoting Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276 (2009)), we have interpreted the provision as casting a very broad "protective

- 22 -

cloak." See id. at 283-84. That is to say, not only is it unlawful to retaliate against an employee for initiating formal legal actions pursuant to Title VII, see, e.g., Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 223 (1st Cir. 2007) (complaining to human resource department and EEOC), but it is also unlawful for an employer to retaliate because an employee merely complains to a supervisor about conduct constituting sex discrimination. See, e.g., Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 41-43 (1st Cir. 2011).[9] Retaliation to informal opposition of a discriminatory employment activity is, in sum, sufficient to violate Title VII.

Franchina brought two claims under Title VII, asserting (1) that she was subjected to a hostile work environment, and (2) that she suffered retaliatory action for having reported sex-based discrimination to her superiors. As we noted, she received a favorable jury verdict on each of her claims in the district court. On appeal, the City shines its spotlight solely on the hostile work environment cause of action. In light of the City's focus,

---

[9] Other examples of unlawful retaliation courts have found under Title VII include retaliation against an employee who involuntarily testified as a witness in a proceeding, see, e.g., Deravin v. Kerik, 335 F.3d 195, 204 (2d Cir. 2003), as well as retaliation in response to an employee who aided a co-worker in asserting her rights. See e.g., Eichman v. Ind. State Univ. Bd. of Trs., 597 F.2d 1104, 1107 (7th Cir. 1979).

- 23 -

we linger not on the retaliation claim, giving our undivided attention instead to the issue with which the City takes umbrage.

To succeed on a hostile work environment claim, six elements must generally be established:

> (1) that [the plaintiff] is a member of a protected class; (2) that [she] was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of [her] employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that [s]he in fact did perceive it to be so; and (6) that some basis for employer liability has been demonstrated.

Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 27 (1st Cir. 2011).[10] This standard, which "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury," Aponte-Rivera v. DHL Sols. (USA), Inc., 650 F.3d 803, 808 (1st Cir. 2011) (quoting Harris, 510 U.S. at 21 (1993)), demands that we "distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).

And determining whether alleged instances of offensive conduct reach the requisite level of pervasiveness and/or severity to constitute actual harassment is by no means a black-and-white

---

[10] It is the third element in this standard that is the primary target of the City's appeal, which we will get into momentarily.

- 24 -

determination. Indeed, we have explained time and again that "[t]here is no mathematically precise test that we employ to answer this question." Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir. 2013). We look, instead, to numerous factors (to which we assign no particular determinative weight) in order to guide us in our resolution of these difficult situations: severity of the discriminatory conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to a mere offensive utterance, and the extent to which it unreasonably interferes with an employee's work performance. Id. Each hostile work environment claim, then, is necessarily evaluated on a case-by-case basis.

Title VII also requires that the plaintiff file charges of discrimination within 180 days of the alleged act. 42 U.S.C. § 2000e-5(e)(1). However, this period extends to 300 days where the plaintiff has "instituted proceedings with a State or local agency with authority to grant or seek relief from such practice." Id.; see also Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 276 (1st Cir. 2014).

In fixing the applicable tolling time, we must keep in mind a key distinction the Supreme Court has articulated between the tolling of (1) discrete incidents of discrimination and (2) hostile work environment claims. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to

- 25 -

hire are easy to identify," Nat'l R.R. Passenger Grp. v. Morgan, 536 U.S. 101, 114 (2002), and, consequently, those "acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Campbell v. BankBoston, N.A., 327 F.3d 1, 11 (1st Cir. 2003) (citation omitted). Hostile work environment claims, on the other hand, generally "do not 'turn on single acts but on an aggregation of hostile acts extending over a period of time.'" Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (quoting Havercombe v. Dep't of Educ., 250 F.3d 1, 6 (1st Cir. 2001)).[11] For this reason, an equitable exception to the 300-day filing period is recognized under Title VII for the "ongoing pattern[s] of discrimination," that are part and parcel with hostile work environment claims. O'Rourke v. City of Providence, 235 F.3d 713, 726 (1st Cir. 2001) (citations omitted); see also Nat'l R.R. Passenger Corp., 536 U.S. at 122. The continuing violation doctrine, in other words, allows plaintiffs to proceed on a hostile work environment claim "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Nat'l R.R. Passenger Corp., 536 U.S. at 122 (emphasis added). Thus, in determining liability in a hostile work

---

[11] Of course, there are instances where a single incident can be so severe that it alone satisfies the "severe or pervasive" prong of a hostile work environment claim. See Gerald, 707 F.3d at 18 (1st Cir. 2013).

environment claim, all "component acts" of the claim that occurred outside of the limitations period may be considered. <u>Tobin</u> v. <u>Liberty Mut. Ins. Co.</u>, 553 F.3d 121, 130 (1st Cir. 2009).

With that legal landscape in mind, we address the City's various arguments, rejecting each one as we go along.

## B. Timeliness

The City's first arrow in its effort to lampoon the district court proceedings is its claim that Franchina failed to present evidence establishing an instance of harassment falling within the applicable statute of limitations under Title VII. The City contends that it was entitled to judgment as a matter of law on that issue and that the lower court erred in denying its motion. Having reviewed the issue de novo, <u>see</u> <u>Cigna Ins. Co.</u> v. <u>Oy Saunatec, Ltd.</u>, 241 F.3d 1, 8 (1st Cir. 2001), we are not persuaded.

Both parties agree that Franchina filed her charge of discrimination with the RICHR on November 30, 2011. As such, Franchina extended her statute of limitations beyond the typical 180-day limit and we therefore look to whether Franchina filed charges within 300 days of the alleged discrimination (i.e., on or after February 3, 2011). <u>See</u> <u>Velázquez-Pérez</u>, 753 F.3d at 276.

The relevant inquiry here is whether Franchina anchored her hostile work environment claim by proving that some instance of harassment happened on or after February 3, 2011. <u>See</u> <u>Nat'l R.</u>

R. Passenger Corp., 536 U.S. at 117 (where a plaintiff proves "that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability").  Here, Franchina testified that she was subject to vulgar obscenities and harassment on her weekly visits to the firehouse while she was out on disability.  She explicitly testified that these visits continued for a "good portion" of 2011.

The City argues that because Franchina did not testify when specifically in 2011 the harassment occurred, she did not meet her burden of proving that some actionable conduct happened on or after February 3, 2011.  Franchina counters that a jury could reasonably infer that a "good portion" of 2011 meant that Franchina returned for more than the first month of 2011 and therefore on or after February 3, 2011.  We agree with Franchina.

We will reverse on appeal only if our review of the record reveals that the evidence required "one conclusion, namely, that the moving party was entitled to judgment." Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 531 (1st Cir. 2015) (quoting Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 1999)).  Here, in order for the City to prevail, it must prove that the only reasonable conclusion one could draw from the evidence is that Franchina stopped returning to the firehouse (and therefore stopped experiencing harassment) before February 3,

- 28 -

2011.  We do not see the evidence in such stark a light.  Indeed, Franchina's testimony that she returned to the firehouse for a "good portion" of 2011 could certainly be understood to mean that she returned past February 3, 2011 (and logic reasonably suggests that the words "good portion" encompassed not merely the first thirty-three days of the year).  Although we agree with the district court judge that more would have been better, we find the testimony presented to be at least minimally sufficient.  Viewing the "cold pages of the record" leaves little room for second guessing the district court's finding, Rodríquez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011), and the City fails to provide us with a compelling reason to do so.

## C. Evidentiary Disputes

Moving on, the City contends here as it did below that the district court erred in its admission of certain evidence, namely the allowance of testimony pertaining to the Union Hall Incident and the admission of a transcript from McGarty's preliminary injunction hearing that resulted from that incident.[12] In particular, the City argues first that all evidence of the Union Hall Incident was admitted in error because it is irrelevant to

---

[12] The briefs refer to the hearing as a "TRO hearing," and call the relevant transcript a "TRO transcript," but that is incorrect.  We take judicial notice that the hearing transcript in the record is from the preliminary injunction proceeding.  See United States v. Bello, 194 F.3d 18, 22-24 (1st Cir. 1999).

workplace harassment.  Second, it asserts that even if evidence of the Union Hall Incident were relevant, the transcript of the restraining order hearing was surely inadmissible hearsay. The admission of both, the City continues, so tainted the fairness of the trial by "engender[ing] a verdict based on sympathy, passion, and emotion."  These arguments do not hit the mark.

We review a district court's admission of evidence for abuse of discretion, Baker v. Goldman, Sachs & Co., 771 F.3d 37, 57 (1st Cir. 2014), a standard which is necessarily deferential. Shervin v. Partners Healthcare Sys. Inc., 804 F.3d 23, 44 (1st Cir. 2015) ("[O]nly rarely--and in extraordinarily compelling circumstances--will we, from the vista of a cold appellate record, reverse a district court's" evidentiary ruling.).  Even if a challenger passes this high hurdle, we will not reverse so long as "it is highly probable that the error did not affect the outcome of the case."  McDonough v. City of Quincy, 452 F.3d 8, 19-20 (1st Cir. 2006).

### 1. The Incident as a Whole

The City's first objection is to the admission of the evidence of the Union Hall Incident generally, which it lodges on relevancy grounds.  Specifically, it contends that the incident occurred outside the workplace and is therefore irrelevant to Franchina's workplace harassment claim.  Franchina counters that incidents outside the workplace involving her colleagues and

supervisors are relevant to establish the severity and/or pervasiveness of her hostile work environment claim.

Making a relevancy-based argument, as the City does, is a rather tough sell. For evidence to be relevant it "need only move the inquiry forward to some degree" on a fact of consequence. Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010) (citation omitted); see also Fed. R. Evid. 401 (relevant evidence has "any tendency to make a fact [that is of consequence] more or less probable"). And relevancy is determined "in light of the underlying substantive law." Bielunas, 621 F.3d at 76. In cases dealing with Title VII, we have previously held that evidence of non-workplace conduct is admissible "to help determine the severity and pervasiveness of the hostility in the workplace." Crowley v. L.L. Bean, Inc., 303 F.3d 387, 409 (1st Cir. 2002).

The City nonetheless seems to argue, without citation, that non-workplace conduct cannot be admitted as relevant unless the incident is directly tied to consequences suffered by the complainant in the workplace. It maintains that as a result of the Union Hall Incident Franchina suffered no material consequences (i.e. reduction of pay, change in work schedule, station relocation, or similar negative actions) at work and that, to the contrary, it was McGarty who was subject to work-based consequences given that his assignments had to be drastically restricted after the injunction issued. We disagree with the

City's admissibility argument. First, we have never mandated that evidence of non-workplace harassment have direct, formal workplace consequences (such as those listed above) for it to be relevant. And even if such an explicit connection were required, which it is not, Franchina testified she did experience workplace consequences, in the form of removal from the firehouse, following the Union Hall Incident.

Second--and not to belabor the point--we have explained that non-workplace incidences are admissible if they cast light on the motivations, pervasiveness, and/or severity of the harassment. See Crowley, 303 F.3d at 409; see also O'Rourke, 235 F.3d at 724, 727 (affirming a verdict in favor of a sexual harassment victim who offered evidence of prank phone calls taking place outside the workplace). Both McCarty, the alleged harasser in the Union Hall Incident, and Lieutenant Jackson, one of the supervisors who failed to intervene, were players in Franchina's workplace harassment claim as each had been insubordinate in a previous rescue attempt episode. Just as testimony that a firefighter on duty refused to cook for her or made Franchina sick helps to establish the pervasiveness and severity of the hostility in her work environment, so too does off-duty evidence demonstrating Franchina was berated, spit at, and otherwise assaulted by a co-worker while a supervising officer stood by. Therefore, the Union Hall Incident was not isolated, non-work related conduct, but rather evidence

- 32 -

supporting the magnitude of the workplace harassment Franchina endured; a permissible means. See Crowley, 303 F.3d at 409.

Because the City's relevancy argument cannot withstand our scrutiny we turn next to the City's challenge to the transcript's admissibility specifically.

## 2. The Preliminary Injunction Hearing Transcript

As noted above, after the Union Hall Incident Franchina sought and then received injunctive relief against McGarty following a multi-witness hearing before the Rhode Island Superior Court. At Franchina's Title VII trial, the district court, over the City's objection, admitted into evidence the hearing transcript from the superior court proceeding. The City contends the admission was erroneous because the transcript was inadmissible hearsay. Franchina disagrees, arguing that the transcript was not admitted to prove what happened at the Union Hall, but rather for the non-hearsay purpose of demonstrating (as the trial court explained in its jury instructions) "that management-level employees of the City [ ] knew or should have known of the harassment, and that those management-level employees failed to implement prompt and appropriate remedial actions that [we]re reasonably calculated to stop the harassment and remedy the situation." We agree with Franchina.

Out-of-court statements are considered "nonhearsay" when they are offered not for the truth of the matter but for some other

purpose.  United States v. Murphy, 193 F.3d 1, 5 (1st Cir. 1999)

("So long as out-of-court statements are not offered for their

truth, they are not hearsay.").  The transcript, then, was

admissible as non-hearsay if, as Franchina argues, it was offered

for the purpose of establishing that the City was, or should have

been, on notice of Franchina's alleged workplace harassment.  See

Kelley v. Airborne Freight Corp., 140 F.3d 335, 346 (1st Cir. 1998)

(hearsay rule does not bar out-of-court statement offered to prove

notice); Tuli, 656 F.3d at 41 (out-of-court statements were

permissibly introduced as non-hearsay because they "remained

relevant for purposes of showing notice to the [employer] and

toleration of a general climate of offensive remarks and

displays").  And the transcript did just that.

Here, multiple employees of the Fire Department

testified at the superior court hearing about the altercation

between McGarty and Franchina.[13]  Those who testified included not

just Franchina and McGarty, but also two higher-ups in the

---

[13] Lieutenant Murphy (who was testifying in support of
McGarty) noted on the record his awareness that during the Union
Hall Incident "an argument ensued, a heated discussion amongst
[Franchina and McGarty]."  He also explained that while
firefighters generally "settle[d] their differences" in the Union
Hall (that is, they didn't bring their work problems home with
them and dealt with them amongst themselves), this incident was
the first time in his twenty-two years on the job that he could
remember "anything leaving the union hall."  Lieutenant Jackson
(who was also testifying in support of McGarty) similarly explained
that an argument between Franchina and McGarty had occurred, though
he was unable to hear what it was about.

Department's leadership, Lieutenant Robert Jackson and Lieutenant Elliot Murphy.[14]  Testimony from senior officers (i.e. those in positions of power) concerning what happened at the union hall, regardless of its truth, could be understood as lending credence to the inference that the Department should have been on notice of the hostile work environment with which Franchina contended.  See Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 231 (1st Cir. 2007) (harassment open and known by management level employees evidenced that the employer knew of the harassment).  Moreover, the transcript evidences a larger knowledge about the alleged harassment among the employees of the Department.  For example, Lieutenant Murphy testified that he filed a report with the Department about the Union Hall Incident and that he knew of the previous alleged incident of insubordination between Franchina, McGarty, and Lieutenant Jackson.  And Lieutenant Jackson testified that he had heard rumors that Franchina was filing a lawsuit against the Department related to his alleged insubordination during a rescue. Such evidence of widespread knowledge among employees can be probative of an employer's notice and, therefore,

---

[14] Firefighter Michael Evora also testified about the fact that he witnessed the argument, but was unable to determine what had caused it and did not hear what they were arguing over.  He did note, however, that he noticed Franchina trying to ask for help from a senior officer during the incident.

was properly admitted for this purpose. Crowley, 303 F.3d at 402-03 (evidence that managers, team leaders, and superiors were aware of harassment evidenced that the employer knew or should have known); White v. N.H. Dept. of Corr., 221 F.3d 254, 261 (1st Cir. 2000) (Title VII requires proving that the supervisors "knew or should have known" of the workplace harassment but "failed to implement prompt and appropriate corrective action").[15]

The events following the preliminary injunction hearing further support the fact that leadership was on notice that the hearing occurred and about what had transpired at the hearing. Indeed, immediately following the superior court's grant of the injunctive relief, Chief Michael Dillon, Assistant Chief of Operations, issued an order barring McGarty from working any call-

---

[15] In what appears to be part of its broader admissibility argument, the City seems to tell us that admission of the transcript was unduly prejudicial and should have been excluded. We've held that when statements "potentially qualif[y] as both hearsay and nonhearsay, the district court may admit it if it is relevant, and if the probative value of its intended nonhearsay use is not substantially outweighed by the risk of the jury considering it for the truth of the matter asserted." United States v. Colón-Díaz, 521 F.3d 29, 33 (1st Cir. 2008); see also Fed. R. Evid. 403. Here, the City's contention that the transcript's probative value is substantially outweighed by the prejudicial effect is made in conclusory terms and without citation or persuasive reasoning. We see no reason to make the City's argument for it, and consider it waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Additionally, we note that the City never asked the court to issue a limiting instruction to the jury regarding the extent to which the transcript could be considered.

backs with Franchina and Chief Scott Mello, a scheduler in the Department, testified about receiving and attempting to implement Mello's order. In light of all of this, we espy no abuse of discretion on the part of the district court.

But, even if the district court erred by admitting evidence of either the Union Hall Incident or the preliminary injunction hearing transcript or both (and by no means do we suggest it did), any such error would necessarily be harmless. There was a plethora of other, independent evidence introduced at trial that more than supports the verdict that Franchina was discriminated against on the basis of her gender. Indeed, in our next section below we outline that evidence in further detail.

### D. Sufficiency of the Evidence: Title VII

The City next maintains that it was entitled to judgment as a matter of law on Franchina's hostile work environment discrimination claim because she failed, in its opinion, to present sufficient evidence under a sex-plus theory of discrimination as required by our Title VII jurisprudence.[16] Our de novo review "is

---

[16] We note here that Franchina argues that the City lacks standing to appeal the hostile work environment discrimination claim. Specifically, she points out that the jury awarded lump sum damages on both her hostile work environment and retaliation claims, but the City did not appeal the retaliation claim. So the argument goes, the City never objected to damages being awarded in a lump sum and so even if they prevail on their appeal with respect to the discrimination claim, lump sum damages are joint and several and therefore fully attributable to the retaliation claim which is

weighted toward preservation of the jury verdict; 'we must affirm unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned [it].'" Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41-42 (1st Cir. 2002) (quoting Walton v. Nalco Chem. Co., 272 F.3d 13, 23 (1st Cir. 2001)). For the reasons that follow, we conclude the City's charge overshoots its target.

## 1. What's Required to Prove a Sex-Plus Claim under Title VII?

Before delving into the heart of the City's argument, we briefly pause to shed some light on what we perceive to be a misapprehension by the City over what is required to prove a hostile work environment claim when a plaintiff (like Franchina) premises her claim on a "sex-plus theory." In short, "sex-plus claims" are a flavor of gender discrimination claims where "an employer classifies employees on the basis of sex plus another

_____

not up for appeal. Franchina thus maintains that there is no live case and controversy and the discrimination claim is moot.

But the City's notice of appeal was all encompassing. It specifically stated that it was appealing "all adverse orders and rulings made by the District Court in this action," including "all judgments and amended judgments." Thus, at the very least, it certainly had standing to challenge the retaliation claim. While it is true that the City provided no argumentation on the merits of the retaliation claim, we will assume (favorably to the City) that the argument was not waived. See De Jesús v. LTT Card Servs., Inc., 474 F.3d 16, 20 n.6 (1st Cir. 2007). That said, we see no need to delve deep into the retaliation issue. Indeed, much of the same evidence that supports the discrimination claim alleged by Franchina similarly supports her retaliation cause of action.

characteristic."  Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law 456 (3d ed. 1996) (emphasis in original)).  The City contends, as best we can tell, that for a plaintiff to be successful under a sex-plus theory, a separate, more stringent evidentiary standard exists than for straight claims of sex discrimination.  The City, it seems, believes that under a sex-plus theory, plaintiffs are required to identify a corresponding sub-class of the opposite gender and show that the corresponding class was not subject to similar harassment or discrimination.  Thus, for Franchina to succeed, the City tells us she is required to have presented evidence at trial of a comparative class of gay male firefighters who were not discriminated against.  Without such a showing, the City contends, it would not be possible to prove that any sort of differential treatment a plaintiff experiences is necessarily predicated on his or her gender.

This approach--one that we have never endorsed--has some rather obvious flaws.  Indeed, at oral argument, the City recognized one of them in its concession that such a standard would permit employers to discriminate free from Title VII recourse so long as they do not employ any subclass member of the opposite gender.  But, of course, that cannot be.  Under such an approach, for example, discrimination against women with children would be

unactionable as long as the employer employed no fathers.  But see Chadwick, 561 F.3d at 41.[17]  The result that would follow from the City's approach would, thus, be inapposite to Title VII's mandate against sex-based discrimination.

Indeed, at the advent of sex-plus claims, courts recognized that "[t]he effect of [Title VII] is not to be diluted because discrimination adversely affects only a portion of the protected class."  Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1198 (7th Cir. 1971), cert denied, 404 U.S. 991 (1971); see also Chadwick, 561 F.3d at 42 n.4 (explaining that "discrimination against one employee cannot be remedied solely by nondiscrimination against another employee in that same group").  Similarly, the effect of Title VII is not to be diluted because discrimination adversely affects a plaintiff who is unlucky enough to lack a comparator in his or her workplace.

The City's position conflicts also with Title VII's text and jurisprudence.  Requiring a plaintiff to point to a comparator of the opposite gender implies the inquiry is that of "but-for" causation.  That is to say, the City's approach requires Franchina to make a showing that, all else being equal (the "plus" factors

_____

[17] Sexual harassment against black women would also be unactionable as sex discrimination as long as the employer employed no black men.  But see Jefferies v. Harris Cnty. Cmty. Action Ass'n, 615 F.2d 1025, 1034 (5th Cir. 1980) ("It is clear from the foregoing cases that an employer may not single out black women for discriminatory treatment.").

being the same), the discrimination would not have occurred but for her gender. Title VII requires no such proof. The text bars discrimination when sex is "a motivating factor," not "the motivating factor." 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."). And, moreover, the Supreme Court has explicitly rejected the "but for" standard. See Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989) ("To construe the words 'because of' as colloquial shorthand for 'but-for causation' . . . is to misunderstand them.").

In sum, the City advocates a standard for sex-plus claims that requires plaintiffs to allege more than what is required for traditional sex discrimination claims. But we have held that sex-plus "does not mean that more than simple sex discrimination must be alleged." Chadwick, 561 F.3d at 43. Chadwick, in other words, made clear that the sex-plus label is no more than a "heuristic . . . , a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment [and obtain a favorable verdict at trial] even when not all members of a disfavored class are discriminated against." Back v. Hastings On Hudson Union Free Sch. Dist., 365

F.3d 107, 118 (2d Cir. 2004). With these principles in mind we move on to the City's sufficiency of the evidence challenge.

## 2. Was there Sufficient Evidence to Support Franchina's Claim?

At core, the City believes that Franchina has presented no evidence to support her claim that the harassment she experienced was a result, at least in part, of her gender.[18] Rather, it contends Franchina inappropriately blurred the line between sex and sexual orientation discrimination under Title VII. According to the City, even though, arguendo, she may have presented evidence demonstrating discrimination as a result of the latter (her sexual orientation), she presented little to no evidence of the former (her gender). And such sexual orientation bigotry, the argument goes, does not enjoy Title VII protection under Higgins v. New Balance Athletic Shoe, Inc., a nearly twenty-year-old case in which we concluded that Title VII does not proscribe harassment based solely on one's sexual orientation. 194 F.3d 252, 258-59 (1st Cir. 1999).[19] While that may be true,

_____

[18] In its brief, the City's argument here is primarily premised on Franchina's failure to present evidence showing that a comparator class (of gay male firefighters) was not subject to the same discriminatory actions alleged by Franchina. For the reasons discussed at length above, however, that argument cannot stand.

[19] Though the tide may be turning when it comes to Title VII's protections, see Hively v. Ivy Tech Community College of Ind., 853 F.3d 339, 341 (7th Cir. 2017) (holding en banc that discrimination on the basis of sexual orientation is a form of sex discrimination), it is not our job here to posit whether Higgins should be reexamined. Though Franchina originally brought a separate claim alleging sexual-orientation discrimination under

we do not believe that Higgins forecloses a plaintiff in our Circuit from bringing sex-plus claims under Title VII where, in addition to the sex-based charge, the "plus" factor is the plaintiff's status as a gay or lesbian individual. Indeed, Higgins expressly disclaimed reaching a conclusion on that issue. See 194 F.3d at 260 (explaining that while appellant made a sex-plus argument on appeal, that claim "never surfaced in the district court" and, therefore, the court would not reach that issue on the merits). In sex-plus claims brought under Title VII "the simple question posed . . . is whether the employer took an adverse employment action at least in part because of an employee's sex." Chadwick, 561 F.3d at 43 (emphasis in original). And we see no reason why claims where the "plus-factor" is sexual orientation would not be viable if the gay or lesbian plaintiff asserting the claim also demonstrates that he or she was discriminated at least in part because of his or her gender.

Here, Franchina presented a plethora of evidence showing that the impetus for the discrimination she sustained was based in part on her being a female. In gender discrimination cases premised on a hostile work environment, Title VII permits a plaintiff to prove unlawful discrimination by demonstrating that

Title VII, the district court dismissed that count at the motion to dismiss stage of this case. Franchina did not appeal that decision and so it is not before us.

the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris, 510 U.S. at 21 (citations omitted). "Evidence of sexual remarks, innuendos, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment." O'Rourke, 235 F.3d at 729. Here, there was repeated evidence that Franchina was called a "bitch," "cunt," and "Frangina." The use of these words is inherently "gender-specific" and their "repeated and hostile use . . . . can reasonably be considered evidence of sexual harassment." Passananti v. Cook Cnty., 689 F.3d 655, 666 (7th Cir. 2012). In fact a "raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'bitch' . . . , has been consistently held to constitute harassment based upon sex." Forrest, 511 F.3d at 229; see also State of Conn. v. Baccala, 163 A.3d 1, 13 (Conn. 2017) (explaining that "fat ugly bitch" and "cunt" are "one or more of the most vulgar terms known in our lexicon to refer to [the female] gender"). This case is no different. In fact, there was more.

There was also evidence that women were treated as less competent; a treatment barred by Title VII. Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are

exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (quotation marks omitted). There was evidence that men treated women better when they were perceived as willing to have sex with them. There was evidence that Franchina was subjected to humiliating sexual remarks and innuendos by Ferro, including asking the plaintiff if she wanted to have babies and if he could help her conceive. This type of sexually based animus is a hallmark of Title VII. Id. (noting that "the inference of discrimination [is] easy to draw . . . [when] the challenged conduct typically involves explicit or implicit proposals of sexual activity"); Marrero, 304 F.3d at 19 (observing that repeated "humiliating sexual remarks and innuendos" are actionable under Title VII).

In sum, the jury heard evidence of repeated hostile, gender-based epithets, ill treatment of women as workers, sexual innuendoes, and preferential treatment for women who were more likely to sleep with the men of the Department. This sampling of evidence demonstrates that the "accumulated effect . . . taken together" constitutes a hostile work environment. O'Rourke, 235 F.3d at 729.

### 3. Did the Judge Accurately Convey to the Jury What was Required Under Title VII?

Lastly, the City quibbles over the judge's jury instructions--specifically as to how he conveyed to the jury what

- 45 -

elements were required in order to prove a sex-plus claim under Title VII. We review preserved claims of instructional error under a split standard. Questions as to whether jury instructions capture the essence of the applicable law are reviewed de novo, while questions as to whether the court's choice of phraseology in crafting its jury instructions is unfairly prejudicial are reviewed for abuse of discretion. DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009). Because the question here is whether the applicable law was adequately conveyed, our review is de novo. The supposedly problematic instruction reads as follows:

> Element three requires that harassment must be based on gender. The plaintiff need not prove that all women were discriminated against or were harassed, but she must prove that she was harassed at least in part because she is a woman.
>
> In other words, she may meet this element by proving that she was harassed because she is part of a subclass of women, in this case lesbians, if she also proves that this harassment was at least in part because of her sex or gender.

The City argues that this instruction is inconsistent with the law, and states that the following sentence should have been added in order for the instruction to be legally sufficient: "If you find that Ms. Franchina faced harassment solely because of her sexual orientation, then she has not proven that she faced harassment because of her gender."

Where "a party assigns error to the failure to give a requested instruction, the threshold inquiry is whether the

requested instruction was correct as a matter of law." Shervin, 804 F.3d at 47. If that threshold is met, the challenger must make two subsequent showings: first that the proposed instruction is "not substantially incorporated into the charge as rendered" and second that it is "integral to an important point in the case." White, 221 F.3d at 263 (quoting United States v. DeStefano, 59 F.3d 1, 2 (1995)).

While the City's requested jury instruction is, in fact, legally correct (thus passing the threshold question), we fail to see what supposed deficiency in the instructions the judge actually gave to the jury would be cured by the City's requested insert. We have made clear that the inquiry in sex-plus claims is whether the harassment was caused "at least in part because of an employee's sex," Chadwick, 561 F.3d at 43 (emphasis in original), which is exactly what the district court instructed. As such, the instruction was "in substance, legally correct," Shervin, 804 F.3d at 47, and the City's requested instruction would have been mere superfluity. Failure to include superfluous language is not an error. Having addressed each of the City's Title VII disputes, we move on.

### E. Front Pay

Even if we decline to invalidate the entire jury verdict--which, for the reasons discussed at length above, we just have--the City argues that at the very least we must still strike the

judge's award of front pay to Franchina.  That is so, the City contends, because the district court erred post-trial when it failed to grant the City's motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e).  The City's argument on this point is three-fold.  First, the City contends that there was no competent evidence to support any award of front pay damages. Second, the City argues that the judge erred in failing to instruct the jury that any front pay award needed to be reduced to present value.  And third, the City takes issue with Franchina's failure to present expert testimony which it says was necessary to support a front pay claim.[20]

We review a district court's ruling on a Rule 59(e) motion for abuse of discretion.  Guadalupe-Báez v. Pesquera, 819 F.3d 509, 518 (1st Cir. 2016).  In doing so, we keep in mind that "[s]uch a motion must either establish a clear error of law or point to newly discovered evidence of sufficient consequence to make a difference."  Id.

---

[20] While numerous other Circuits have explicitly stated front pay determinations are only to be made by a judge and should never go to a jury, see, e.g., Duke v. Uniroyal Inc., 928 F.2d 1413, 1424 (4th Cir. 1991); Fortino v. Quasar Co., A Div. of Matsushita Elec. Corp. of Am., 950 F.2d 389, 398 (7th Cir. 1991); Newhouse v. McCormick & Co., Inc., 110 F.3d 635, 643 (8th Cir. 1997), and though we have previously noted that there may be some question concerning the propriety of a jury making front pay calculations in our Circuit, see Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 380 n.8 (1st Cir. 2004) (citing Lindemann & Grossman, Employment Discrimination Law 640-41 (Cane, Jr. et al. eds., 3d ed. 1996)), this issue is not before us today.

- 48 -

"[F]ront pay, within the employment discrimination universe, is generally equitable in nature.  It follows a fortiori from the equitable nature of the remedy that the decision to award or withhold front pay is, at the outset, within the equitable discretion of the trial court."  Lussier v. Runyon, 50 F.3d 1103, 1108 (1st Cir. 1995) (citations omitted) (emphasis in original).  And in a similar context (the equitable award of back pay) under Title VII, our abuse of discretion standard must necessarily be "measured against the purposes which inform Title VII."  Albemarle Paper Co. v. Moody, 422 U.S. 405, 417 (1975).  These purposes, our judicial superiors tell us, include "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."  Id. at 421.  Further, our precedent makes plain that we are "flexible . . . in the construction of remedial awards," Selgas v. Am. Airlines, Inc., 104 F.3d 9, 13 (1st Cir. 1997), and, therefore, we generally give district courts significant latitude in awarding front pay.  See Lussier, 50 F.3d at 1110 (explaining that "[b]ecause the hallmarks of equity have long been flexibility and particularity . . . . a rule that confers latitude upon the district court to handle the interface between [an issue related to] front pay differently in different cases is fully consistent with this storied heritage").  This flexibility also derives in large part from the inherently imprecise nature of the award.  See Johnson v. Spencer Press of

Me., Inc., 364 F.3d 368, 380 (1st Cir. 2004) (explaining that awarding of front pay "necessarily involve[s] predictions of events yet to come"). As such, "decisions as to front pay are generally afforded more deference than decisions as to back pay." Id. "After all, the dispensation of front pay--if only because of its relatively speculative nature--is necessarily less mechanical than back pay, and the amount of front pay--if only because of its predictive aspect--is necessarily less certain than back pay." Lussier, 50 F.3d at 1109 (internal citation omitted).

In requesting front pay, the burden is on the plaintiff--here, Franchina--to present evidence in support of the award. Cf. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 236 (1st Cir. 2006). And while we have never before needed to explicitly spell out the factors a court may consider in determining whether front pay is justified, courts throughout the country have looked at a wide range of indices in the crafting of fair front pay awards, including (but certainly not limited to):

> (1) the plaintiff's age, (2) the length of time the plaintiff was employed by the defendant employer, (3) the likelihood the employment would have continued absent the discrimination, (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment, (5) the plaintiff's work and life expectancy, (6) the plaintiff's status as an at-will-employee, (7) the length of time other employees typically held the position lost, (8) the plaintiff's ability to work, (9) the plaintiff's ability to work for the defendant-employer, (10) the employee's efforts to mitigate damages, and (11) the amount of any liquidated or punitive damage award made to the plaintiff.

Ogden v. Wax Works, Inc., 29 F. Supp. 2d 1003, 1015 (N.D. Iowa 1998) (internal citations omitted) (collecting cases from our Circuit as well as our sisters in the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits). Finally, we note that "when future payment or other pecuniary benefits are to be anticipated, the [award] should be made up on the basis of their present value only." St. Louis Sw. Ry. Co. v. Dickerson, 470 U.S. 409, 411 (1985). And failure to instruct the jury to reduce an award of future payment to present day value ordinarily requires a new trial. See Conway v. Electro Switch Corp., 825 F.2d 593, 603 n.5 (1st Cir. 1987) ("We note, as a final matter, that the jury was not instructed to reduce its award of front pay to present value, thus . . . the district court must order a new trial on the front pay question.").

## 1. Exploring the Arguments

Because the City's second argument does not cause us to tarry, we begin there. The City contends that the judge's front pay jury instruction constituted reversible error because it failed to instruct the jury that any award needed to be reduced to present day value. Given our clear case law, ordinarily we would agree.[21] However, we ask the reader to recall that, although the

_____

[21] Had the district court not made an independent award, our standard of review would be de novo rather than abuse of

- 51 -

district court did initially submit the front pay issue to the jury, it went a step further and exercised its equitable discretion to independently (and alternatively) award Franchina front pay (and at the same time clearly stated the award had been reduced to present day value).  And the City is in agreement that a judge may fashion a front pay award--at the charge conference, the City's counsel argued that the front pay question should not be given to the jury because "front pay is an equitable matter to be determined by the Court."  Therefore, because the City makes no challenge to the district judge's ability to make front pay determinations, we move on to discuss the City's more substantive attacks, the essence of both being the City's contention that "[Franchina] presented virtually zero evidence upon which a jury or the Court could fashion an appropriate award on front pay."

The City challenges the sufficiency of Franchina's front pay award claiming she failed to meet her burden of presenting the "essential data" needed to calculate such an award.  Relying on a D.C. Circuit case, the City tells us "essential data" constitutes "the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount

discretion.  See DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009) (explaining that we review de novo questions as to whether jury instructions capture the essence of the applicable law).

rate." See Barbour v. Merrill, 48 F.3d 1270, 1279 (D.C. Cir. 1995) (citation omitted).

We agree that Franchina bore the burden of proving her entitlement to front pay in the amount awarded. We disagree, though, that she failed to produce any evidence in support of the district court's determination. In deciding on a request for front pay, a district court can consider an array of issues. A non-exhaustive list includes the following: Is the plaintiff able and allowed to return to work with the employer? What pay and benefits was she receiving? What other work can and will she likely obtain to offset the loss? What pay increases might she have obtained had she remained employed? For how long would she have worked? What will be the effects of inflation? What will be the rate of return on any award?

Franchina's evidence covered most but not all of these factors (for instance she did not propose a discount rate). In terms of the evidence she did present, though, Franchina demonstrated the following: She had been earning $98,000 to $130,000 per year while employed with the Department; she is permanently disabled from continuing a career as a first responder in the Department; and she is receiving $25,000 per year in disability benefits. There was also testimony that she possessed excellent professional skills and leadership qualities, and although she started in the Department as an entry-level Rescue

Technician, she quickly moved through the ranks and reached the level of Rescue Lieutenant (a leadership position). Furthermore, Franchina had worked for ten years in the Department, yet was only 44 years old at the time she left her job. The Department's pension structure also encouraged Department employees to maintain employment for great lengths of time. Indeed, future benefits were linked with longevity of service. And she put on evidence that numerous other employees spent upwards of 30-35 years with the Department.

Given all of this, the crucial factor in estimating future lost wages was the number of years that her annual unadjusted loss of $73,000 to $105,000 would have continued. Twenty years would have generated a figure of $1.4 million to $2 million. Adding in for inflation and lost pension would have bumped this number up. Reducing to present value may have reduced it as much, or perhaps more. On this record, we see no reason to conclude that the record's omission of a discount rate rendered an award of $545,000 improper as a matter of law, at least where the adjudicator is a trial judge likely well familiar with the concept of present value. Clearly the judge assumed that the future was uncertain, and an award for over $1 million unwarranted. Its ample discretion to discount for uncertainty dwarfed as a practical matter any loss of precision in discounting for a reasonable rate of return where the likely duration was perhaps five years.

Certainly the court could have awarded much less. But its failure to insist that Franchina provide it with more precise information provides no reason to set aside the award.

Nonetheless, the City posits that even if we conclude Franchina presented significant (and relevant) evidence going to "essential data" for crafting a front pay award, it says her damage claim is still doomed because she failed to produce an expert witness who could provide the fact finder with a proper methodology for reducing any award to present day value.[22]

The City's primary contention is that it is "standard practice" for plaintiffs in employment discrimination suits to present expert testimony on future earnings. Based on this supposed norm, the City tells us that it thus follows that expert testimony must always be a requirement for calculating front pay. To support its argument, the City directs us to Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350 (11th Cir. 1994), and Lussier, 50 F.3d 1103, two cases where expert testimony was, in fact, presented at trial. But those cases do not assist the City because neither

_____

[22] And even though the district court, in making its independent front pay determination, expressly indicated that it had discounted the award to present day value, the City argues there is no indication it actually did so. Rather, as the City accuses, the district court "did not make its own determination, equitable or otherwise . . . but merely accepted the jury's [unsupported] front pay award." Given the considerable discretion afforded the district court in fashioning an equitable remedy, we have no reason to believe the court didn't do what it said it had done.

*Virgo* nor *Lussier* tackled the issue we are confronted with here--whether expert testimony is a precondition for the calculation of any front pay award.

The City points to no First Circuit case in which we reached the conclusion the City now advocates for (and we have found none in our independent search).[23] However, several of our sister circuits have had occasion to opine on this issue. None have concluded that expert testimony on reduction to present day value is a mandatory prerequisite for an award of future earnings. See *Maxfield* v. *Sinclair Int'l*, 766 F.2d 788, 797 (3d Cir. 1985) ("Nor do we believe that expert testimony was needed to reduce the damage award to present value."); *Bonura* v. *Sea Land Serv., Inc.*, 505 F.2d 665, 668–69 (5th Cir. 1974) (explaining that actuarial and mathematical evidence are not prerequisites for recovery of lost future wages); *Pa. R.R. Co.* v. *McKinley*, 288 F.2d 262, 265 (6th Cir. 1961); *Heater* v. *Chesapeake & Ohio Ry. Co.*, 497 F.2d 1243, 1250 (7th Cir. 1974); *Duncan* v. *St. Louis-San Francisco Ry. Co.*, 480 F.2d 79, 87 (8th Cir. 1973); *Cassino* v. *Reichhold Chems., Inc.*, 817 F.2d 1338, 1348 (9th Cir. 1987).

Moreover, we have at least once before implied that no expert testimony is needed in situations like this. In *McDonald* v. *Federal Laboratories, Inc.*, 724 F.2d 243 (1st Cir. 1984), we

_____

[23] The City also fails to point us to a single case from any of our sister circuits reaching such a conclusion.

upheld a district court's jury instruction that failed "to specify a particular present value discount rate [and] fail[ed] to set forth a formula for the jury to reduce to present value any damages awarded for future diminution of earning capacity." Id. at 247. Instead, the district court there merely instructed the jury to reduce the award to present value, using a "reasonable rate of interest." Id. We recognized that this rather simplistic instruction was the result of the "the parties' own failure to provide probative evidence of an appropriate discount rate," but nevertheless, we found no error in the court's instruction. Id. (emphasis added). To accept the City's argument that Franchina's future earnings damages should be thrown out for lack of expert testimony would be odd in light of our upholding of the front pay award in McDonald (where we specifically acknowledged the lack of probative evidence on discount rate and left the factfinder to its own devices in properly discounting for present value). See id.

Additionally, we have found that at least some district courts in our Circuit have assumed this rule for years. See McKeown v. Woods Hole, 9 F. Supp. 2d 32, 48 n.16 (D. Mass. 1998) (explaining that "[t]he majority of courts also do not require evidence, whether by expert testimony and/or annuity tables, suggesting to the jury a method to reduce future loss of earnings to its present value"); Worden v. Consol. Rail Corp., 689 F. Supp. 35, 37–38 (D. Mass. 1988) ("[P]laintiff's failure to come forth

with expert or other evidence regarding methods of present value computation is not fatal.").

And we note that over fifty years ago the Sixth Circuit explicated in Pennsylvania R. Co. v. McKinley, 288 F.2d at 265, that "[j]urors are presumed to be intelligent people, generally aware, from today's economy and their own experience with it, of the earning value of money when placed in safe investments." In other words, because the effect of inflation and interest rates on the value of money is otherwise self-evident (and assumed to be common knowledge), "a jury, unaided by specific testimony as to money values, could themselves, being told that the award should be only money value, properly apply the applicable rule." Id. This logic applies with even greater force to judges given, as we mentioned earlier, that they are routinely called upon to make front pay calculations and are presumed to be more knowledgeable about necessary reductions to present day value and how to make them. See Monessen Sw. Ry. Co. v. Morgan, 486 U.S. 330, 341-42 (1988).

Given all of this, we decline to adopt an absolute rule mandating the presentation of expert testimony in every instance in determining future pay. Moreover, based upon our review of the entire record, we find no evidentiary insufficiency and no abuse

of discretion in the district court's front pay call.[24]   We thus leave Franchina's award of damages undisturbed.[25]

## Conclusion

The abuse Lori Franchina suffered at the hands of the Providence Fire Department is nothing short of abhorrent and, as

---

[24] The City suggests that because Franchina's proposed witness list did not designate an expert to calculate the discount rate, it assumed she was not seeking a front pay award.  Had it known she was, in fact, asking for future earnings, it might have retained an expert of its own on this topic.  While it is unfortunate that the City made this dubious assumption, it in no way impacts our outcome here.  In the complaint, Franchina clearly stated in her Title VII claim against the City that she "suffered and continues to suffer damages."  The City, then, should have been on notice that she was seeking damages and could certainly have posed in an interrogatory (which is meant to clarify the scope of the allegations in the complaint) a question to ascertain precisely what types of damages Franchina was seeking.  Furthermore, in the City's pre-trial memorandum (filed a month and a half before trial), it included proposed jury instructions on the topic of damages stating: "You may determine the amount of any wages and fringe benefits plaintiff would have earned in his [sic] employment with defendant were it not for defendant's wrongful conduct." (Emphasis added).  Such language clearly suggests that the City was aware that Franchina could seek front pay.

[25] We pause to note that while both parties also point us to our recent decision in Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525 (1st Cir. 2015), to support their respective arguments, we are not convinced it is relevant to our analysis.  In Travers we were tasked with determining the validity of a front pay award (for purported loss of wages spanning a twenty-year time frame) supported by only non-expert testimony. Id. at 545.  Unlike here, however, the award in that case was based on both federal and Massachusetts law and "the damages were not apportioned between them." Id. at 546 n.15.  We noted that the crux of our analysis in Travers "considered only Massachusetts law." Id. at 545 n.14. Thus it is not fully clear how transferable the holding in Travers is to the case at hand and so we do not rely on it.  Still, for the reasons explained above, any consideration of Travers--even assuming it were relevant--would result in the same outcome.

this case demonstrates, employers should be cautioned that turning a blind eye to blatant discrimination does not generally fare well under anti-discrimination laws like Title VII.

**Affirmed.**  Costs awarded to appellee.